BAYONNE TEXTILE CORPORATION, a body corporate, complainant-respondent,

*v.*

AMERICAN FEDERATION OF SILK WORKERS, RAPHAEL BROWN, OLGA SACAROFF and NATHAN BURN, defendants-appellants.

[Submitted February term, 1934. Decided May 4th, 1934.]

*Mr. Joel Gross,* for the appellants.

*Mr. J. Edward Bennett* and *Messrs. Cole & Morrill,* for the respondent.

The opinion of the court was delivered by

HEHER, J.

Complainant, a manufacturer of broad silks and rayon, filed a bill praying relief from alleged unlawful interference with its property rights by defendants. It was averred that complainant, who is the operator of a plant at the city of Bayonne on the plan technically known as the "open shop," had conformed to the provisions of the National Industrial Recovery act, approved by the congress on June 16th, 1933

(*15 U. S. C. A. §§ 701 et seq.*) ; that the wages paid to its employes met the standard prescribed by the act and the code adopted in accordance therewith for the government of the silk industry (which, for the time being, was the cotton textile industrial code) ; that defendant American Federation of Silk Workers, a voluntary association of silk workers of national authority, with a branch in the county of Hudson, whose design and purpose with reference to complainant was to compel it to operate its plant as a "closed shop," and to coerce it into employing none but members of the defendant union, fomented a strike of complainant's employes, and conducted it in mode and manner calculated to intimidate complainant's employes, and thereby induce and compel them to leave complainant's service, or, failing that, to create such a state of fear and apprehension as to impair their efficiency and, to a substantial degree, the quality of the service rendered to complainant.

It was charged that insults, indecent and annoying language and abusive epithets were hurled at complainant's employes, by pickets acting for defendants, as they passed to and from complainant's plant; that they were threatened with physical violence if they did not withdraw from complainant's service; that windows of complainant's plant, about thirty in number, were broken by defendants, or those acting on their behalf; that defendant union, through its agents and servants, "unlawfully interfered with complainant's business in encouraging, inducing and compelling persons employed by complainant, by threats, intimidation, force or violence, to refuse to perform their duties as such employes, and to remain away from its employ;" and that, by reason of the "unlawful interference and instigation of" defendant federation, all of complainant's employes joined in the strike. It was also alleged that the strike was conducted by a strike committee of the defendant union, under the supervision of the defendants Brown and Sacaroff, who were assisted by defendant Burn; that the picketing of complainant's plant consisted of the "personal molestation and annoyance of persons employed or willing to be employed by

complainant," for the purpose of coercing them into withholding their services, and thus to terminate the plant's operations; and that, as a result of the practices pursued by defendants and those associated with them in the prosecution of the strike which they declared, there was a cessation of manufacture.

It is insisted that defendants, by this course of conduct, offended against the provisions of the National Industrial Recovery act, and the public policy therein declared, in that they thereby hindered and hampered industrial recovery and employment, and that, additionally, they interfered with complainant's property rights to the service of its employes, and to the peaceful enjoyment of its property. It is further asserted that the strike is in violation of the Recovery act, and the code adopted pursuant thereto, in that defendants and their co-workers did not first submit their grievances and demands to complainant through representatives of their own choosing, and did not first exhaust their remedy within the tribunals provided for in the act and code. It is also alleged that if defendants persist in the specified unlawful conduct, complainant's business will be totally destroyed, and its property will greatly diminish in value.

A restraint *pendente lite* was granted, and from the order therefor defendants appeal. It is sweeping in character. It restrains not only unlawful conduct, but also that which has hitherto been regarded as lawful. It enjoins not only the intimidation and coercion of complainant's employes by violence, threats, annoyances and other unlawful practices, but the conduct of the strike itself. It prohibits defendants "from participating, promoting, encouraging, directing, or being in anywise engaged in any strike against or picketing of the complainant, its business or factory." Affirmative action on the part of the employes is expressly limited to organizing and bargaining collectively with complainant, "through representatives of such employe's own choosing, from among their own number, to seek an equitable adjustment of such grievances" as they may have against complainant "relating to labor conditions in complainant's factory."

The vice-chancellor proceeded on the assumption that the National Industrial Recovery act outlaws strikes. The restraining order recites that the act, and the code adopted pursuant thereto, "manifest a public policy to put an end to strikes by workers employed in industry and trade, * * * by providing a forum for mediation of grievances between employers and employes. In his opinion the vice-chancellor declared: "In view of the means afforded employes to effect mediation of alleged grievances against their employer before impartial mediators such as provided under N. R. A., it is inconceivable that they should be permitted to resort to strikes *ad libitum* against their employer. Such practices, while the aims and purposes of N. I. R. A. and of N. R. A. are sought to be effected, must be regarded as taboo." He also asserted that in view of the means thus afforded "for equitable readjustments of real or fancied grievances between an employer and its employes * * * courts of equity cannot countenance strikes against employers engaged in industrial pursuits, and picketing in connection therewith, particularly by intermeddlers, where no fair effort has been made to adjust alleged grievances by employer and employes."

But in this he was clearly in error. We do not find expressed in the Recovery act a congressional purpose to deprive the employes of the right to strike where, as here, their demand for a wage increase is not complied with. It is fundamental that the intention and policy of·congress, as expressed in the enactment, should be effectuated. The act should receive a sensible construction—one that will not lead to injustice, oppression, or an absurd consequence. The reason and spirit of the law should prevail over its letter. *Lau Ow Bew* v. *United States, 144 U. S. 47; 12 Sup. Ct. 517; 36 L. Ed. 340; Jacobson* v. *Massachusetts, 197 U. S. 11, 39; 25 Sup. Ct. 358; 49 L. Ed. 643; United States* v. *Kirby, 74 U. S. 482; 19 L. Ed. 278.* This statute is an emergency measure. It is so denominated. Its general object is to effect industrial recovery. The immediate objectives, in the attempted fulfillment of the general plan and purpose, are, *inter alia,* (1) to promote the organization of industry for

the purpose of co-operative action among trade groups; (2) to induce and maintain united action of labor and management under adequate governmental sanctions and supervision; (3) to eliminate unfair competitive practices; (4) to promote the fullest possible utilization of the present productive capacity of industries; (5) to increase the consumption of industrial and agricultural products by increasing purchasing power; (6) to reduce and relieve unemployment; and (7) to improve standards of labor. *15 U. S. C. A. § 701.*

The president is authorized, upon application made by one or more trade or industrial associations or groups, or upon his own motion, to "approve a code or codes of fair competition" for the government of the trade or industry in question, or any subdivision thereof, for the effectuation of the policy declared by the act. The provisions of such code shall be the standards of fair competition for such trade or industry, or subdivision thereof. *Ibid. § 703.* Destructive wage and price cutting are contrary to the policy of the act, and, in order to guard against such practices, the president is invested with the power to license business enterprises. *Ibid. § 704.*

The act, in terms, confers upon employes the right to organize and bargain collectively, *through representatives of their own choosing.* Section 7 (a) (*Ibid. § 707*) provides that every such code of fair competition, agreement, and license approved, prescribed, or issued under the act, shall contain the following conditions:

"(1) That employes shall have the right to organize and bargain collectively through representatives of their own choosing, and shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection;" and—

"(2) that no employe and no one seeking employment shall be required as a condition of employment to join any company union or to refrain from joining, organizing, or assisting a labor organization of his own choosing; * * *"

The right to organize and bargain collectively connotes the right to strike in event that such course is deemed ad-

visable by the employes for their mutual aid or protection.
The latter is an incident of, and imparts efficacy to, the
former. It cannot be that congress intended to reserve the
right of collective action, in respect of wages, and to deprive
the employes of the only weapon at their command to make
its exercise effective—a lawful weapon devised to secure the
enforcement of a fundamental right. A construction that
would deny to the employes the privilege of striking, to en-
force what they conceive to be a just demand for a wage
increase, would emasculate and devitalize the clause confer-
ring the right to organize and bargain collectively. The
denial of this long-established fundamental right to strike
would, in effect, compel acceptance of the scale of wages
fixed by the employer. The act does not provide compulsory
arbitration, in any form, of wage controversies. And "collec-
tive bargaining" is not bargaining at all, in any just sense,
unless it is voluntary on both sides. *Hitchman Coal and
Coke Co.* v. *Mitchell, 245 U. S. 229; 38 Sup. Ct. 65; 62
L. Ed. 260.*

The act does not empower the president to prescribe rates
of pay and hours of service, binding upon employers and
employes alike, nor was there any attempt here to assume
such authority. Subdivision (3) of section 7 (a) obliges the
employers to "comply with the maximum hours of labor,
minimum rates of pay, and other conditions of employment,
approved or prescribed by the president." *Ibid.* § 707. It
will be perceived that the *employers* are bound only to ob-
serve the *maximum* hours of labor, and the *minimum* rates
of pay established by the president. But the act does not
impose upon the employes the obligation to accept the rates
of pay or the maximum hours of labor thus ordained. They
are clearly at liberty to bargain, individually or collectively,
for a higher rate of pay and hours of labor less than the
maximum so designated. This right is expressly recognized
by another provision of the act. Section 7 (c), which con-
fers upon the president authority to differentiate, in the
exercise of the power thus granted, according to experience
and skill of the employes affected, and according to the locality

of the employment, enjoins "any classification according to the nature of the work involved which might tend to set a maximum as well as a minimum wage." *Ibid.* § 707 (c).

In the permissive clause of the restraining order under review, this right of employes to organize and bargain collectively, through representatives of their own choosing, is qualified to require that such representatives be selected *"from among their own number."* This manifestly is an unwarranted attempt to modify the requirements of the act. It is a palpably unjustified interpolation. The learned vice-chancellor evolved the theory that the Recovery act, by the provisions in question, makes the individual plant the exclusive unit for collective bargaining, and denies to all non-employes, termed "intermeddlers," the right of participation in such endeavors. This is obviously a misconception. The act does not, expressly or impliedly, so circumscribe the activities of the employes in striving for their mutual welfare and protection. Such a provision would run counter to a long-established federal policy in dealing with organized labor, growing out of the enforcement of the employes' constitutional guarantees. It was clearly not the purpose of congress, as a part of the emergency program, to put collective bargaining on this parochial basis.

Many of complainant's employes joined the defendant trade union, an affiliate of the American Federation of Labor, a responsible labor organization with nation-wide jurisdiction, before the strike was inaugurated. The interpretation of the act adopted by the vice-chancellor would outlaw this organization, and prevent the affiliation of the individual unions with a body organized to promote the common aims and purposes, at least to the extent of making unlawful the rendering of aid and assistance by the principal body to secure the redress of the grievances of employes in the individual plant, and in advancing their common interest and welfare. The vice-chancellor would go further. He would prevent the employes of the individual plant from participating in any organization but one composed of the plant's own employes, under the sole leadership

of persons selected from its members, and limit their activities to seeking "an equitable adjustment" of their "grievances relating to labor conditions" in their own plant. A congressional purpose to effect this radical departure from a firmly established policy will not be implied. It must be expressed in clear and unequivocal language.

The personal liberty and right of property guaranteed by the fifth amendment of the federal constitution embrace the right to make contracts for the purchase of the labor of others, and equally the right to make contracts for the sale of one's. own labor. The enjoyment of these constitutional rights is subject always to the fundamental condition that no contract, whatever its subject-matter, can be sustained, which the law, upon reasonable grounds, forbids as inconsistent with the public interest, or as hurtful to the public order, or as detrimental to the common good. *Adair* v. *United States, 208 U. S. 161, 174; 28 Sup. Ct. 277; 52 L. Ed. 436; Coppage* v. *Kansas, 236 U. S. 1, 14; 35 Sup. Ct. 240; 59 L. Ed. 441; Hitchman Coal and Coke Co.* v. *Mitchell, supra.* It would indeed be anomalous if society, itself an organization that fosters association for the achievement of a common objective in every conceivable field of endeavor, if not contrary to positive law or inimical to the public welfare, should bar the union of workingmen. The law, therefore, recognizes the right of workingmen to unite and to invite others to join their ranks, thereby making available the strength, influence and power that come from such association. By virtue of this right, powerful labor unions have been organized. *Gompers* v. *Buck's Stove and Range Co., 221 U. S. 418; 31 Sup. Ct. 492; 55 L. Ed. 797.*

Labor unions, when instituted for mutual help and cooperation, and the attainment of legitimate ends, are lawful. They are a necessary part of the social structure. They are a vital force in our industrial system, and essential for the advancement of the public welfare. The economic independence and security of labor are vital for the public order and welfare. As we have quite recently pointed out, it has long been regarded as a proper function of the state to

foster the welfare and safeguard the interests of wage-earners. Economic and other considerations underlie this long established state policy. The amelioration of the condition of labor is recognized by enlightened government as a duty of paramount importance. And this solicitude for the wage-earners is not alone for the members of the favored class, but for the common good. It is conducive, if not, indeed, essential to the well-being of society that the economic security and contentment of the class that contributes so largely to the furnishing of its material needs be effected and sedulously maintained. *Long* v. *Republic Varnish Enamel, &c., Co., 115 N. J. Eq. 212.*

The achievement of these highly desirable objectives cannot be had without union. Only thus can a fair measure of equality be had between the employer and the employe in the making of contracts for the purchase and sale of labor. Labor unions, in the words of Chief Justice Taft, "were organized out of the necessities of the situation. A single employe was helpless in dealing with an employer. He was dependent ordinarily on his daily wage for the maintenance of himself and family. If the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and to resist arbitrary and unfair treatment. Union was essential to give laborers opportunity to deal on equality with their employer. They united to exert influence upon him and to leave him in a body, in order, by this inconvenience, to induce him to make better terms with them. They were withholding their labor of economic value to make him pay what they thought it was worth. The right to combine for such a lawful purpose has, in many years, not been denied by any court. The strike became a lawful instrument in a lawful economic struggle or competition between employer and employes as to the share or division between them of the joint product of labor and capital. To render this combination at all effective, employes must make their combination extend beyond one shop. It is helpful to have as many as may be in the same trade in the same community united, because, in the competition

between employers, they are bound to be affected by the standard of wages of their trade in the neighborhood. Therefore they may use all lawful propaganda to enlarge their membership, and especially among those whose labor at lower wages will injure their whole guild. It is impossible to hold such persuasion and propaganda, without more, to be without excuse and malicious. * * * The *Hitchman Case* (*Hitchman Coal and Coke Co.* v. *Mitchell, supra*) was cited in the *Duplex Case* (*Duplex Printing Press Co.* v. *Deering, 254 U. S. 443; 41 Sup. Ct. 172; 65 L. Ed. 349*), but there is nothing in the *ratio decidendi* of either which limits our conclusion here, or which requires us to hold that the members of a local labor union and the union itself do not have sufficient interest in the wages paid to the employes of any employer in the community to justify their use of lawful and peaceable persuasion to induce those employes to refuse to accept such reduced wages and to quit their employment." *American Steel Foundries* v. *Tri-City C. T. Council, 257 U. S. 184; 42 Sup. Ct. 72; 66 L. Ed. 189.*

The legality of collective action on the part of employes, for the protection and safeguarding of their mutual interests, cannot be questioned. It is a firmly established doctrine of our federal jurisdiction that employes are entitled to organize for the purpose of securing the redress of grievances, and to promote agreements with employers relating to rates of pay and conditions of work. *Texas & N. O. R. Co.* v. *Brotherhood Ry. & S. S. Clerks, 281 U. S. 548; 50 Sup. Ct. 427; 74 L. Ed. 1034.*

And it is manifestly not essential to the legality of the combination that it be confined to the same community. That is not a requirement of the common law. The union, no matter how large or how powerful, is not an unlawful organization, nor is it an unlawful conspiracy under the common law. The law does not impose any limit upon the bargaining power which labor may acquire by union. This doctrine is given clear recognition in *Gompers* v. *Buck's Stove and Range Co., supra.* It is not the size of the union that taints it with illegality. It is rather the unlawful means or methods em-

ployed, or the striving for the attainment of an unlawful object—the abuse of the power thereby given—that brings it within the condemnation of the law.

And the defendants cannot be regarded as "inter-meddlers." They have not intruded in the legal sense. Agency indubitably existed. Employes of the complainant were members of the union when the strike was declared. The members of the defendant union and the employes of complainant, present and expectant, had a common interest in the rate of wage and the conditions of labor in the industry generally. They were not remote from any connection with or control over the matters in controversy. This was patently not a malicious interposition, but one wholly justified by the common interest in maintaining a proper standard of living. Self-interest was the motive—a yearning for the terms and conditions of labor that, in their opinion, was their due, alone was the stimulus. Action of this character was justified when, in their view, the common interest was menaced. Concededly, there was no attempt to induce any of complainant's employes to leave its service in violation of any contract of employment. To render such concerted action unlawful, the object or the means used must be unlawful or exercised for the malicious purpose of injuring another; mere concert of action, in and of itself, not being sufficient to render the act illegal. *New Jersey Painting Co.* v. *Local No. 26, Brotherhood of Painters, &c., 96 N. J. Eq. 632, 637.*

In the last cited case this court upheld the rule adopted by an international painters' union, obliging a contractor who undertakes the performance of work "away from his home town" to pay the rate of wages and observe the union conditions prevailing in his home town, if that rate of wages or working conditions were more favorable to the workman than the union scale prevailing in the district in which the work was to be done; or, if the converse were true, the union scale and union conditions prevailing in the place in which the work was to be done. Mr. Justice Black said (at *p. 638*): "The rule adopted and promulgated by the defendants is not aimed at and does not apply to the complainant solely.

It does not seek to establish arbitrary discriminations between one person or corporation and another. It applies to all employing painters within the whole territory of the United States who undertake to do work outside of their home districts. It applies to all alike, automatically, who come within the prescribed rule. Co-operation in some form now seems to be an economic necessity in all businesses, trades and occupations throughout the United States, if not throughout the entire world." He held that (*p. 639*) : "The union may arbitrarily fix a uniform scale of wage applicable to all its members and strike to enforce its demands, *i. e.*, either to maintain or advance a scale of wages; and the strike will not be interfered with by the courts if it is lawfully carried on." In dealing with the contention that the union could not, without unjust discrimination, adopt a rule providing for "a sliding scale of wages to fit ostensibly the varying local economic conditions throughout the United States," he said (*p. 640*) : "The attack is aimed, not at the combination, but at its effect upon the employers. This is unsound, both legally and economically. In the last analysis the prime object of the rule attacked is to establish a standard of wages. * * * The law gives the defendants a right to sell their labor to whom they please, when and under such conditions as they may fix, individually or in combination. They may make rules and regulations, passed in good faith, providing for what they deem to be an economic advantage to themselves."

We do not interpret the case of *Duplex Printing Press Co.* v. *Deering, supra,* as holding the contrary. It is not an analogous case. The question there presented was the legality of a "secondary boycott;" that is, a combination not merely to refrain from dealing with complainant, or to advise or by peaceful means persuade complainant's customers to refrain ("primary boycott"), but to exercise coercive pressure upon such customers, actual or prospective, in order to cause them to withhold or withdraw patronage from complainant through fear of loss or damage to themselves should they deal with it.

This right, therefore, apart from its constitutional basis,

is firmly imbedded in what has long been regarded as sound public policy in treating with labor. And it is a well-established rule that, for the purpose of determining the meaning, but not the validity, of a statute, recourse may be had to considerations of public policy  While the statute is designed to cope with the existent national emergency, said to be "productive of widespread unemployment and disorganization of industry, which burdens interstate. and foreign commerce," a purpose to disregard sound public policy must not be attributed to the lawmaking power, except upon the most cogent evidence. *Jersey City Gaslight Co.* v. *Consumers' Gas Co., 40 N. J. Eq. 427; Waltham Watch Co.* v. *Keene, 202 Fed. Rep. 225, 241; affirmed, 209 Fed. Rep. 1007, certiorari denied, 232 U. S. 724; 34 Sup. Ct. 602; 58 L. Ed. 815.* The natural import of the words employed in the statute, according to their common use, when applied to the subject-matter of the act, is to be considered as expressing the intention of the lawmaking body, unless the intention, so resulting from the ordinary import of the words, be repugnant to sound, acknowledged principles of national policy. And if that intention be repugnant to such principles of national policy, then the import of the words ought to be enlarged or restrained, so that it may comport with those principles, unless the legislative intention be clearly and manifestly repugnant to them. *Opinion of Justices, 7 Mass. 523.* Compare *Church of the Holy Trinity* v. *United States, 143 U. S. 457; 12 Sup. Ct. 511; 36 L. Ed. 226.* There should be no greater modification of or departure from this firmly established policy than the statute expressly declares. "It is not lightly to be assumed that congress intended to depart from a long-established policy." *Robertson* v. *Railroad Labor Board, 268 U. S. 619; 45 Sup. Ct. 621; 69 L. Ed. 1119.*

And the view that it was incumbent upon complainant's employes to resort to "mediation of [their] alleged grievances before impartial mediators such as provided under N. R. A.," is likewise untenable. The code adopted to effectuate the declared policy of the statute, and approved by President Roosevelt, prescribes a minimum wage and maxi-

mum hours of labor, and provides generally for measures calculated to preserve the balance of productive activity with consumption requirements, the stabilization of industry, and the prevention and elimination of unfair and destructive competitive prices and practices. It contains no provision for the submission to any governmental or other authority, or to arbitration, of controversies respecting wages, as a prerequisite to the institution of a strike. It provides for the submission to an industrial relations committee, chosen by the joint action of the employer and employes, and state and national industrial relations boards, constituted as therein provided, of controversies arising between the employer and employes "as to the stretch-out (or specialization) system, or any other problem of working conditions." This manifestly does not include a controversy respecting wages. *Ejusdem generis.* Even so, resort to these tribunals is not compulsory. Compare *Texas & N. O. R. Co.* v. *Brotherhood Ry. & S. S. Clerks, supra.* And here neither side invoked the aid of these tribunals for an adjustment of the controversy. The act provides merely that either side "may" invoke the jurisdiction of the bodies thus created. Moreover, these provisions are *ex necessitate* subject to, and the code expressly so provides, the provisions of section 7 of the Recovery act.

It follows that, in the particulars mentioned, the learned vice-chancellor erroneously interpreted the Recovery act, and the injunction against a continuance of the strike was unwarranted.

If the strike itself were unlawful, as in contravention of the provisions of the Recovery act, the restraint against picketing in any form was, of course, proper, but, inasmuch as this is not the case, it remains to consider whether the attending circumstances warrant a continuance of the restraint against picketing of a peaceable, as well as an unlawful, character. We do not think so.

True, there was evidence of unlawful acts, such as the breaking of windows of complainant's plant on one occasion, and the use, by individual participants in the strike, of abusive epithets and scurrilous and threatening language,

and indulgence in other illegal practices calculated to intimidate. But there was no evidence that these unlawful acts and practices were sanctioned or acquiesced in by appellants. And there is nothing to show that the conduct of defendants tended immediately and directly to unlawful acts by those associated with them in the common enterprise. They did not instigate, or incite the strikers and others to, violence or other illegal conduct or practices. The behavior exhibited by the affidavits is not such as to indubitably characterize the whole enterprise and course of conduct as an unlawful attempt to effect a deprivation of complainant's property rights. The unlawful occurrences were not such as to give character to the entire course of conduct, and reveal an illegal intention and purpose on the part of defendants and the pickets. On the contrary, the affidavits submitted by defendants are persuasive of an intention and purpose to refrain from picketing that would not meet·the standard prescribed by law. The defendants established, by uncontradicted evidence, that they conformed, in respect of picketing, to the demands of the local police officials, and otherwise co-operated with them in their efforts to repress disorder and illegal conduct. The proofs do not establish that the pickets were grouped in such number as to constitute intimidation and obstruction. The police officials in charge permitted not more than twenty girls, ungrouped, to act as pickets at a given time, and did not allow the posting of pickets within one hundred and fifty feet of complainant's plant. Picket service was rendered by girls only.

The right to strike includes the right to use peaceable and lawful means to induce present and expectant employes to join the ranks. This rule has long been recognized in this state. It is expressly ordained by statute. *3 Comp. Stat. p. 3051 § 128; P. L. 1926 p. 348.* The means employed are lawful, if peaceable and devoid of the elements of intimidation and obstruction. *Bayer* v. *Brotherhood of Painters, &c., 108 N. J. Eq. 257; New Jersey Painting Co.* v. *Local No. 26, Brotherhood of Painters, &c., supra; Keuffel & Esser* v. *International Association of Machinists, 93 N. J. Eq. 429;*

*Baldwin Lumber Co.* v. *Local No. 560, &c., 91 N. J. Eq. 240; Jersey City Printing Co.* v. *Cassidy, 63 N. J. Eq. 759, 762; Cumberland Glass Mfg. Co.* v. *Glass Bottle Blowers' Assn., 59 N. J. Eq. 49, 53; Mayer* v. *Journeymen Stonecutters' Association, 47 N. J. Eq. 519, 531; American Steel Foundries* v. *Tri-City C. T. Council, supra.*

Picketing is lawful if it does not have an immediate tendency to intimidation of the other party to the controversy, or to obstruct free passage such as the streets afford, consistent with the right of others to enjoy the same privilege. *Keuffel & Esser* v. *International Association of Machinists, supra; American Steel Foundries* v. *Tri-City C. T. Council, supra; Nann* v. *Raimist, 255 N. Y. 307; 174 N. E. Rep. 690.* The modern view is that picketing is not *per se* unlawful, and should not be enjoined, if peaceably carried on for a lawful purpose.

The general rule is that a preliminary injunction will not issue where the material facts in complainant's bill and affidavits, on which complainant's right depends, are met by a full, explicit and circumstantial denial under oath. It will issue only where the denial lacks these essential qualities, and upon the entire showing from both sides it appears reasonably probable that the complainant had the right claimed. *Ideal Laundry Co.* v. *Gugliemone, 107 N. J. Eq. 108, 115.*

The case of *Keuffel & Esser* v. *International Association of Machinists, supra,* is not analogous in fact. The sweeping injunction against picketing in every form there allowed was predicated upon a finding of the employment of extreme measures designed to effect intimidation and obstruction. Mr. Justice Swayze said: "It might, perhaps, be claimed that the terms of the injunction from which an appeal was taken was unnecessary, in view of the extent of the other restraint, but they were necessary to present the different question of the right to restraint when the situation is such that what would otherwise be peaceful persuasion, becomes in the *actual fact a system of terrorism.*" Such was not the case here. As was said by Chief-Justice Taft: "Each case must turn on its own circumstances. It is a case for the

flexible remedial power of a court of equity, which may try one mode of restraint and, if it fails or proves to be too drastic, may change it. * * * It becomes a question for the judgment of the chancellor." *American Steel Foundries* v. *Tri-City C. T. Council, supra.* The purpose in the individual case should be to prevent intimidation and obstruction.

The observation made by Chief-Justice Gummere, in his dissenting opinion in *Keuffel & Esser* v. *International Association of Machinists, supra,* is also pertinent here: "It is to be borne in mind that the purpose of an injunction is not to punish for past offenses or violations of the law, but to protect in the future those who have suffered from such violations against a continuance thereof." The remedy by injunction is preventive and not punitive. It does not issue "as punishment for the past. Its only legitimate end is protection for the future." *Nann* v. *Raimisl, supra.* And since the *Keuffel & Esser Case* was decided, the legislature ordained (*P. L. 1926 p. 348*) that no injunction shall issue, in a case such as this, against peaceable picketing, or the employment of means and methods, in the promotion of a strike, that do not constitute intimidation or obstruction. The statute gives recognition to the modern trend of thought in relation to the use of the injunctive process in labor cases, and is a valid enactment. It does not, in any respect, deprive the employer of a fundamental right secured by the fourteenth amendment. *American Steel Foundries* v. *Tri-City C. T. Council, supra.* Whether the promoters of a strike, who, in its furtherance, resorted to unlawful means and methods, may, when injunctive relief is sought, invoke this statute, is a question we are not called upon to decide.

Inasmuch as there was evidence of illegal acts by the pickets and their associates, it was proper to restrain defendants from a repetition of such unlawful conduct. The management of the strike was in their hands. Concededly, they formed and maintained a picket line to make the strike effective. Their insistence is that they did not direct, consent to, or acquiesce in the unlawful acts, but a restraint directed to

them was nevertheless justified: for the misconduct occurred in the performance of the duties for which the pickets had been employed. The unlawful acts were done in defendants' behalf, and for their benefit, and in aid of the strike promoted by them. *Connett* v. *United Hatters of North America, 76 N. J. Eq. 202, 207; Hitchman Coal and Coke Co.* v. *Mitchell, supra; Local Union 313 H. & R. E. I. A.* v. *Stathakis, 135 Ark. 86; 205 S. W. Rep. 450; 6 A. L. R. 894; Southern Railway Co.* v. *Machinists Local Union No. 14, 111 Fed. Rep. 49, 54; Great Northern Railway Co.* v. *Local Great Falls Lodge of International Assn. of Machinists, 283 Fed. Rep. 557.*

The order is modified accordingly, and, as so modified, affirmed, and the cause remanded for further proceedings in conformity with this opinion.

*For modification*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, DILL, JJ. 15.