THE PRUDENTIAL INSURANCE COMPANY OF AMERICA AND THE MUTUAL BENEFIT LIFE INSURANCE COMPANY, PLAINTIFFS-RESPONDENTS, v. CHARLES R. HOWELL, COMMISSIONER OF BANKING AND INSURANCE OF THE STATE OF NEW JERSEY, AARON K. NEELD, DIRECTOR OF THE DIVISION OF TAXATION OF THE STATE OF NEW JERSEY, AND INTERVENOR, STATE OF NEW JERSEY, DEFENDANTS-APPELLANTS, AND THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, PLAINTIFF-RESPONDENT, v. CHARLES R. HOWELL, COMMISSIONER OF BANKING AND INSURANCE OF THE STATE OF NEW JERSEY, AARON K. NEELD, DIRECTOR OF THE DIVISION OF TAXATION OF THE STATE OF NEW JERSEY, AND INTERVENOR, STATE OF NEW JERSEY, DEFENDANTS-APPELLANTS.

Argued January 5, 1959—Decided February 2, 1959.

Mr. *David M. Satz, Jr.,* Deputy Attorney-General, argued the cause for the defendants and intervenor-appellants (*Mr. David D. Furman,* Attorney General of New Jersey, attorney).

Mr. *Edward J. O'Mara* argued the cause for the plaintiffs-respondents (*Messrs. O'Mara, Schumann, Davis & Lynch,* attorneys; *Messrs. Sylvester C. Smith, Jr.* and *James A. Hession,* of counsel).

The opinion of the court was delivered by

BURLING, J. These are consolidated actions instituted in the Superior Court, Law Division, for declaratory judgments, brought by plaintiff insurance companies against the Commissioner of Banking and Insurance and the Director of the Division of Taxation, and seeking a judgment declaring that certain payments made by plaintiffs to holders of annuity contracts are deductible from taxable considerations under *N. J. S. A.* 54:18A–5. The State of New Jersey was granted leave to intervene and filed counterclaims for back taxes and interest against each of the plaintiffs. The Superior Court, Law Division entered the judgment sought by plaintiffs and dismissed the counterclaims. The defendants and the intervenor prosecuted an appeal to the Superior Court, Appellate Division. While the cause was pending there, motion for direct certification, pursuant to *R. R.* 1:10–1A, was made by defendants and granted.

Pursuant to *N. J. S. A.* 54:18A–3, life insurance companies doing business in this State are required to pay a 2% tax on "taxable premiums collected" by them under all insurance policies issued on New Jersey residents and a 1% tax on the "taxable considerations collected" under annuity contracts on such residents.

*N. J. S. A.* 54:18A–5 defines these terms as follows:

"\* \* \* taxable premiums and taxable considerations, as specified in section three of this act, are hereby defined to be gross contract premiums and gross considerations, less the sum of the following:

(a) Premiums received for reinsurance assumed and premiums or considerations (but excluding cash surrender values) returned on policies or contracts,

(b) Dividends paid in cash, used by policy holders in payment of renewal premiums, or left on deposit with the company, and

(c) Discount on premiums paid in advance."

The question at issue is whether *N. J. S. A.* 54:18A–5(a) permits a deduction as "considerations returned \* \* \* on contracts," sums returned by the companies to holders

of group and individual annuity contracts under the following circumstances:

GROUP ANNUITY CONTRACTS

(a) Upon termination of employment of an employee prior to the commencement of annuity payments.

(b) Upon the death of an employee prior to the commencement of annuity payments.

(c) Upon the cancellation of the contract by the employer.

INDIVIDUAL ANNUITY CONTRACTS

(a) Upon the death of a prospective annuitant prior to the commencement of annuity payments.

(b) Upon the cancellation of the contract by the prospective annuitant prior to the commencement of annuity payments.

Since the effective date of the Tax Act, 1945, plaintiffs have deducted from the amount of gross considerations collected under annuity contracts on residents of this State, all benefits returned by them to policyholders under the above listed circumstances during the years 1944 to 1955, inclusive, with the exception of Mutual and Prudential which did not, during that period, deduct benefits returned under individual annuity contracts in instances of withdrawal.

During the period in question plaintiffs filed annual reports with the Commissioner of Banking and Insurance on or before the first day of March in each year for the years 1945 to 1956, inclusive, as required by *N. J. S. A.* 54:18A–8, claiming the aforesaid deductions. After receipt of such annual report, the Commissioner is required on or before the first day of May each year, to ascertain and to report to the Director of the Division of Taxation, all facts necessary to enable the Director to fix the amount of tax payable by plaintiffs. *N. J. S. A.* 54:18A–8.

None of the reports, so filed by plaintiffs, was questioned or objected to by the Commissioner or Director. Taxes billed by the Director were paid by plaintiffs when due in each year.

In 1957 and prior to the institution of suit the Commissioner and Director asserted that under *N. J. S. A.* 54:18A–5(a) the sums deducted under the aforementioned

circumstances from the amount of gross considerations by plaintiffs in their earlier annual reports were not "considerations returned" within the meaning of the statute, but rather were "cash surrender values" and hence not deductible, and that similar deductions would not be permissible in the annual report due March 1, 1957.

Plaintiffs on February 2, 1957 filed the instant consolidated actions under *N. J. S.* 2A:16–50 *et seq.* seeking a declaratory judgment as to the meaning of the statutory provision (*N. J. S. A.* 54:18A–5(*a*)) permitting deduction of "premiums or considerations (but excluding cash surrender values)" returned on policies or contracts as applied to moneys paid to policyholders of group and individual annuity contracts under the previously outlined circumstances.

The State of New Jersey as intervening defendant filed counterclaims demanding judgment for additional taxes on the sums so deducted for the years 1944 to 1955, inclusive, together with interest and costs.

The Superior Court, Law Division, Judge Lane, entered a judgment construing the statute favorably to plaintiffs' position and dismissing the counterclaims.

Attention should first be focused upon the meaning of "cash surrender value" as utilized in *N. J. S. A.* 54:18A–5(*a*). It is the position of the plaintiffs, and the trial court so found as a fact, that the term "cash surrender value" is a technical term in the insurance industry and has reference only to policies of life insurance and has no application whatever to payments made under annuity contracts.

The asserted technical meaning stems in part, at least, from the basic difference between life insurance policies and annuity contracts. The risks assumed under life insurance policies and under annuity contracts are diametric opposites. Life insurance involves the traditional elements of insurance, *i. e.,* shifting of risk of loss and distribution of risk of loss over a broad base. Annuity contracts, on the other hand, are basically investments. The fundamental

distinction is aptly set forth in 1 *Appleman, Insurance Law and Practice,* § 83, *p.* 76 (1941), as follows:

"Ordinarily, it is recognized, even by laymen, that contracts of life insurance and of annuity are distinctly different. One involves payments of stated amounts, known as premiums, by the insured over a period of years in return for which the insurer creates an immediate estate in a fixed amount in the event of his death while in good standing. * * * There is an immediate hazard of loss thrown upon the insurer, with the required performance by the insured of certain obligations at designated intervals of time.

An annuity contract is almost diametrically opposed to this. The person designated as the recipient is the person paying the money. He pays in a fixed sum at one time, in return for which the company must then perform a series of obligations over a period of years, at designated times. The hazard of loss is no longer upon the company but upon the recipient who may die before any benefits are received. Instead of creating an immediate estate for the benefit of others, he has reduced his immediate estate in favor of future contingent income. The positions are almost exactly reversed. Annuity contracts must, therefore, be recognized as investments rather than as insurance."

The courts have often had occasion to refer to these basic differences for purposes of estate and inheritance taxes, and have found them controlling in that sphere, see *e. g., Cruthers v. Neeld,* 14 *N. J.* 497 (1954); *Central Hanover Bank & Trust Co. v. Martin,* 129 *N. J. Eq.* 186 (*Prerog.* 1941), affirmed 127 *N. J. L.* 468 (*Sup. Ct.* 1942), affirmed 129 *N. J. L.* 127 (*E. & A.* 1942), affirmed *Central Hanover Bank & Trust Co. v. Kelly,* 319 *U. S.* 94, 63 *S. Ct.* 945, 87 *L. Ed.* 1282 (1943); *Hagy v. Kelly,* 135 *N. J. Eq.* 436 (*Prerog.* 1944); *Helvering v. Le Gierse,* 312 *U. S.* 531, 61 *S. Ct.* 646, 85 *L. Ed.* 996 (1941).

█ Bearing in mind the dichotomy between the two types of contracts, it is not strange that a technically descriptive term such as "cash surrender value" would not be carried over from one type of contract to another within the trade. We concur in the factual finding of the trial court, as testified to by plaintiffs' experts, that within the insurance business "cash surrender value" has a technical meaning, *i. e.,* a refund of the accumulated reserve (the excess of net level premiums over the cost of insuring the

policyholder for the time the policy was in force with, in some instances, an added surrender charge) plus interest, applicable only to policies of life insurance. The finding that the term "cash surrender value" has in fact the technical and limited meaning in the insurance business contended for by the plaintiffs is buttressed by an exhibit introduced in evidence which is a blank form of annual statement that *N. J. S. A.* 17:23-1 requires the Commissioner of Banking and Insurance to furnish to all insurance companies for purposes of showing their financial condition. The statute further requires this form to conform substantially to the form of statement adopted by the National Association of Insurance Commissioners. On page 5 of the annual statement form there is a gain and loss statement. At the top of the page there are column headings indicating various types of insurance contracts. On the side there are various items which are to be included under each column heading. It is significant that the items entitled "Death Benefits and Surrender Benefits" are crossed out under the columnar headings of "Individual Annuities" and "Group Annuities." Thus, apparently, both the Department of Banking and Insurance and the National Association of Insurance Commissioners do not recognize that death or surrender benefits have any meaning when those terms are applied to annuity contracts, although they do have meaning in life insurance policies.

But the defendants counter that if the term "cash surrender value" has a technical meaning it also has an ordinary meaning. This is evidenced by the fact that in several of the standard annuity contracts issued by the plaintiffs the policyholder is given an option to receive what is denominated in the policy as a "cash surrender value" and in other individual and group annuity contracts the phrase "cash value" was frequently utilized by the plaintiffs.

Plaintiffs' experts explained this usage in annuity contracts was due to the fact that "cash surrender value" was a term familiar to the public because of its usage in life insurance policies, and was therefore carried over into an-

124

nuity contracts to generally describe what would be returned
to the annuitant if the contract were cancelled.

The inference most favorable to defendants which can be
derived from the plaintiffs' usage in the standard annuity
contracts is that the term "cash surrender value" is am-
biguous, having a technical meaning to those in the insur-
ance industry and a different meaning to a layman. This
is a dilemma which *R. S.* 1:1–1 does not solve. *R. S.*
1:1–1 provides in part:

"In the construction of the laws and statutes of this state, * * *
words and phrases shall * * * be given their generally accepted
meaning, according to the approved usage of the language. Technical
words and phrases, and words and phrases having a special or ac-
cepted meaning in the law, shall be construed in accordance with
such technical or special and accepted meaning."

Nor can the primary problem of what the Legislature in-
tended when it employed the term be resolved by reference
to the plain meaning or literal interpretive canon.

■ It should be parenthetically observed that the defend-
ants seek to draw an additional inference, other than the
fact that "cash surrender value" is sometimes utilized in
a non-technical sense, from the fact that the term was
utilized by plaintiffs in their standard insurance contracts,
namely, that such usage constitutes an admission against
interest on the part of plaintiffs which is fatal to their
position in the instant case. This argument is without merit
for two reasons. First, the plaintiffs have offered sufficient
evidence to satisfy both the trial court and this court, that
the term "cash surrender value" does have the technical
meaning contended for, and further they have satisfactorily
explained their seeming inconsistent usage in the standard
annuity contracts. Secondly, and more important, we are
concerned with determining the *legislative* intention in
adopting the fulcral language "premiums or considerations
(but excluding cash surrender values) returned on policies
or contracts." Plaintiffs cannot, by means of an alleged
admission against interest, be estopped from denying lia-

bility for a tax which they contend the Legislature did not intend to impose, especially, where, as here, the reason for the usage is explained.

 The basic inquiry, then, is whether the Legislature intended the phrase "cash surrender value" in its technical signification, or in some other sense broad enough to include refunds made to annuity contract holders on death or cancellation of their contracts, prior to the happening of the condition triggering annuity payments. In our view the Legislature employed the term in its technical meaning, *i. e.,* as applicable only to life insurance policies and not to annuity contracts.

This conclusion is, in part at least, arrived at by an examination of other statutes employing the term "cash surrender value." For instance *N. J. S. A.* 17:34–15 sets forth the standard provisions which must be included in all policies of life insurance issued in this State, and requires the inclusion of a "cash surrender value" clause based upon a mortality table. *N. J. S. A.* 17:34–19 then specifically provides that this requirement "shall not apply to * * * annuities." Moreover, the Standard Nonforfeiture Law (*N. J. S. A.* 17:34–21.1) enacted in New Jersey in 1943 makes it mandatory to include a cash surrender clause based on a stated mortality table and rate of interest in all life insurance policies issued or delivered in this State. Again, subsection (f) of that statute expressly provides in part: "This section shall not apply to any reinsurance, group insurance, pure endowment, *annuity* or reversionary annuity contract," (emphasis supplied). Thus, just two years before the enactment of *N. J. S. A.* 54:18A–5 (*L.* 1945, *c.* 132, *p.* 490, § 5), the Legislature manifested an intention that the term "cash surrender value" is applicable only to policies of life insurance.

Another factor suggestive of the limited usage contended for by plaintiffs is the fact that the only two reported decisions on the question at issue in the instant case were decided in two other jurisdictions several years prior to the enactment of *N. J. S. A.* 54:18A–5. Both of these

decisions resulted in a construction of the state taxing law similar to that presently urged by the plaintiffs.

In the landmark case on the problem, *Equitable Life Assurance Society of United States v. Johnson,* 53 *Cal. App. 2d* 49, 127 *P. 2d* 95 (*D. Ct. App.* 1942), the court was required to construe *Article* XIII, *section* 14(b) of the *California Constitution,* which read as follows:

"Every insurance company or association doing business in this state shall annually pay to the state a tax of one and one half per cent upon the amount of the gross premiums received upon its business done in this state, less return premiums and reinsurance in companies or associations authorized to do business in this state * * *." (127 *P. 2d* at *page* 97).

The first issue raised by Equitable was whether considerations received by the company in annuity contracts were "gross premiums received" under the California Constitution. Equitable argued that the term "premiums" was one peculiarly associated with policies of life insurance, and that the payments made by annuity policyholders were properly designated as considerations. The court concluded that:

"It follows, from an analysis of the California constitutional and statutory provisions, from an analysis of the proper meaning of the term 'premium,' and from the weight of authority outside the state, that considerations received upon the sale of annuities are 'premiums' and are taxable as such, and that the position taken by plaintiff on its appeal is unsound." (127 *P. 2d* at *page* 106).

The second issue raised by Equitable was the one raised in the instant case: whether refunds of annuity considerations were deductible under the provision permitting a deduction for "return premiums." The State in the *Johnson* case argued that the "phrase must be limited to such or similar situations [rescission for fraud or mistake] and cannot be extended to include refunds and cash values paid to holders of annuity contracts upon the cancellation of their policies before the annuity takes effect." The California court agreed with the State's assertion that "cash surrender value" required to be paid on contracts of life

insurance were not "return premiums" within the meaning of the Constitution, but expressly declared that refunds on annuity contracts were "return premiums":

"For these many reasons, we think it to be clear that cash or surrender values paid on the cancellation of a life insurance policy are not return premiums as used in the tax provision in question. But that does not determine that cash or surrender values paid on the cancellation of a pure annuity contract prior to the starting of payments to the annuitant are not return premiums. * * * Annuity contracts provide by their terms for refunds to the purchaser upon cancellation. If they did not so provide, few purchasers would be found for them. Payments so refunded before the risk attached—i. e., before payments start to the annuitant—regardless of whether *sections* 2617 and 2618 of the *Civil Code* are applicable, are by contract 'return premiums' within the meaning of the Constitution." (127 *P.* 2d at *page* 109.)

While the court remanded the cause for further findings on the types of refunds involved and the amounts, the parties agreed to a "Stipulation for Judgment," the plain effect of which was to uphold a deduction of returned considerations on the type of annuity contracts here in issue. A similar result was reached by the court in *Equitable Life Assurance Society of United States v. Hobbs,* 155 *Kan.* 534, 127 *P.* 2d 477 (*Sup. Ct.* 1942).

An analysis of *N. J. S. A.* 54:18A–1 *et seq.* reveals that it is a tightly drafted act and that terms are used with precision. Our statute plainly differentiates between "premiums" and "considerations," the former applicable to policies of insurance and the latter to annuity contracts. In 1945, in drafting a specialized tax act such as *N. J. S. A.* 54:18A–1 *et seq.,* all of those concerned must have been aware of the problems faced by California and Kansas in the *Johnson* and *Hobbs* cases, *supra,* decided only three years before. The inference is strong that in including the parenthetical phrase "(but excluding cash surrender values)" in *N. J. S. A.* 54:18A–5(*a*) the Legislature intended to follow the result reached in those cases.

Since 1945 two other states have had occasion, under their local taxing statutes, to pass upon the question posed in the instant case and have held that returned considerations

on annuity contracts are deductible. *Metropolitan Life Insurance Co. v. Stratton (Circuit Court of Sangamon County, Illinois,* 1946) (unreported); *Equitable Life Assurance Society v. Hitchins (Baltimore, Maryland, City Court, April* 2, 1957) (unreported).

The defendants urge that there is no significant difference between cash surrender values on life insurance and monies returned to a prospective annuitant on surrender or cancellation of the contract prior to the maturity date, at least insofar as the legislative objectives of the taxing statute are concerned. The defendants further assert that absent a showing of reasonable relationship between the deductions allowed by the court below and the underlying purposes of the statute, *i. e.,* a tax upon the total insurance business done by the company within this State, the construction contended for by plaintiffs would render unconstitutional as a discriminatory benefit prohibited by *N. J. Const.* 1947, *Art.* I, *Sec.* I and *Art.* IV, *Sec.* VII, *par.* 8, and the 14*th Amendment* of the *United States Constitution.*

Thus, the issue raised is whether there is a rational basis for distinguishing between the cash surrender value on a life insurance policy and the return of the considerations paid on an annuity contract, in light of the nature and basis of the tax imposed. If so, then not only is the constitutional problem raised overcome, see *Robson v. Rodriguez,* 26 *N. J.* 517 (1958), but the final litmus test of legislative intention is met.

Plaintiffs lay stress on the essential differences between cash surrender values on policies of life insurance and the return of considerations paid on annuity contracts—defendants stress the similarities. The plaintiffs argue that from the standpoint of the insurance company, a life insurance policy creates an immediate risk attaching when the first premium is paid, whereas in an annuity contract, the primary risk assumed, *i. e.,* that the annuitant may outlive his life expectancy, does not attach until the annuity matures. In life insurance the premium immediately becomes part of a reserve fund accumulated pursuant to a

mortality table to provide for the benefits set forth in the policy. Under the level premium plan the excess of premium deposits in the early years are accumulated, with interest, in the reserve fund to form the policy reserve. When the policy is surrendered, the cash surrender value is calculated by taking the premiums that have been paid up to the date of surrender, plus a proper interest factor, minus the expense allocable to the policy and minus a mortality charge (which is the cost of insuring the policyholder for the period in which the policy was in force).

. A deferred annuity contract, on the other hand, is similar to a deposit of money at interest prior to maturity—an accumulation year by year of the stipulated purchase price. The return to the policyholder upon termination or cancellation of the contract under the circumstances here in issue, is calculated on the basis of the considerations paid by the policyholder plus interest thereon, minus the expenses of the company. The mortality factor does not enter into the determination of a refund of considerations under an annuity contract. Thus, plaintiffs argue that the amount returned to the policyholder under an annuity contract is nothing more than a consideration returned as that term is used in the statute, and is not a "cash surrender value" which differs from a returned consideration in that a mortality factor is subtracted from the premiums returned.

The defendants contend that the difference of a mortality factor is not one which has a reasonable relationship to the purpose of the taxing statute. It is argued that both cash surrender values on life insurance and cancellation or termination benefits on annuity contracts, although calculated on different bases, are both essentially "bargained-for" conditions and therefore differ from refunds which arise as a result of rescission predicated, for example, on fraud or mistake.

The difference, from the point of view of the tax statute, is that in the case of life insurance, where the policy is terminated at the instance of the insured, the company has done business for the period in which the policy was in

force. It has received a significant consideration and has engaged, during that period, in the business of insurance. On an annuity contract, on the other hand, the company has not received a significant consideration. The deduction of a minor charge for expenses of administration is not a gainful activity. Upon termination of the contract, it cannot be said to have done business for the period in which the contract was in force. From the standpoint of the company the result is similar to where the contract has been rescinded for cause.

And if we bear in mind that the tax imposed by *N. J. S. A.* 54:18A–1 *et seq.* is a tax on the gross business transacted, it is not difficult to discern a valid and rational basis for distinguishing between allowing the insurance company a deduction from gross proceeds collected for the return of the policyholder's equity where no business has been done by the company, but not allowing it where it has. The "doing business" theory is one which has been emphasized by some of the cases as the controlling factor. *Cf. German Alliance Ins. Co. v. Van Cleave,* 191 *Ill.* 410, 61 *N. E.* 94 (*Sup. Ct.* 1901); *People ex rel. Continental Ins. Co. v. Miller,* 177 *N. Y.* 515, 70 *N. E.* 10 (*Ct. App.* 1904).

■ It should be emphasized that although the Legislature may, it need not have allowed a deduction from "gross considerations" for considerations returned from annuity contracts. The tax being one on gross premiums and considerations, the choice was its to make. The intention to allow the deduction is derived from the factors outlined in the foreportion of this opinion which lead to the conclusion that the phrase "cash surrender value" was used in its technical sense as relating to life insurance policies and is not applicable to annuity contracts. The distinction between the two situations, in terms of doing business, serves to provide a rational basis for differential treatment, in relation to the ultimate purposes of the act, and buttresses the conclusion previously arrived at.

For the reasons advanced, the judgment appealed from is affirmed.

HEHER, J. (dissenting). The crucial inquiry here concerns the legislative design; and I find no indication of an intention to distinguish between life insurance policies and annuity contracts in the ordained exclusion, *L.* 1945, *c.* 132, *N. J. S. A.* 54:18A–5(*a*), of "cash surrender values" as an allowable deduction from the "taxable premiums and taxable considerations" as specified in *section* 3 of the act, defined in *section* 5 "to be gross contract premiums and gross considerations," less, *inter alia,* "(a) Premiums received for reinsurance assumed and premiums or considerations (but excluding cash surrender values) returned on policies or contracts, * * *."

I would not have the intent of the lawgivers determined as a fact on "expert" testimony that "* * * within the insurance business 'cash surrender value' has a technical meaning, *i. e.,* a refund of the accumulated reserve (the excess of net level premiums over the cost of insuring the policyholder for the time the policy was in force with, in some instances, an added surrender charge) plus interest, applicable only to policies of life insurance."

The arrangement of clause (a), the apparent parenthetical modification of "premiums or considerations," followed by the words "returned on policies or contracts," is in my understanding a negation of the suggested limitation of the "cash surrender values" provision to life insurance policies. Indeed, Prudential and Mutual have, since the adoption of the act, made no such deductions in any case involving an individual annuity contract "(b) [u]pon the cancellation of the contract by the prospective annuitant prior to the commencement of annuity payments," but now assert the right to do so hereafter. And, as pointed out by the majority, the annuity contracts at issue here provide for "cash surrender values" or "cash value." Plaintiffs' witness Shepherd explained that the term "cash surrender value" was employed in annuity contracts "* * * because we thought the public would understand it because of their familiarity with the term in their life insurance policies." But is not this the essential sense and significance

of the transaction as conveyed by these plaintiffs to the annuitants by the terms used to express the mutual intention and expectations? *George M. Brewster & Son, Inc. v. Catalytic Construction Co.,* 17 *N. J.* 20 (1954). A contract makes known agreement and obligation; and here by common acceptance the expression has a certain and definite application to annuity contracts. The parties themselves have given the contract a characterization that is now rejected as illusory.

The payment of premiums on life insurance policies according to the "level premium method," and the deduction of "expense allocable to the policy" and a "mortality charge" in determining the cash surrender value of the policy, are not conclusive of the distinction offered by plaintiffs in assessing the legislative intent and purpose. Plaintiffs' witnesses Menagh, Peterson and Lunsford all testified in substance and effect that annuity surrender values are determined by the sum of premiums or considerations paid plus accrued interest, minus the company expenses; and they and plaintiffs' actuarial witness Guertin also affirmed that the "cash surrender value" of life insurance policies represent the premiums paid plus accrued interest, less company expenses and the cost of the insurance to the point of surrender or cancellation of the policy, deemed to be the "mortality factor," an actuarial assumption "according to some mortality table, that the policyholders in the class in which that policy is issued, will die according to a certain rate based on age." Thus, the "cash surrender value" of life insurance policies means premiums plus interest, minus expense including the "mortality factor"; and so also the "considerations" returned on an annuity contract represent premiums plus interest minus expenses. Compare *Guggenheim v. Rasquin,* 312 *U. S.* 254, 61 *S. Ct.* 507, 85 *L. Ed.* 813 (1940).

Unlike the illustration of an annuity contract given in 1 *Appleman, Insurance Law and Practice,* § 83, as a payment by the person designated as the "recipient" "in a fixed sum at one time, in return for which the company must

then perform a series of obligations over a period of years, at designated times," the annuity contracts here provide for payments in installments. And there are provisions for death benefits; and, in case of cancellation under a non-forfeiture clause, the annuitant is given the option of a cash surrender value: if the annuitant should die before the annuity date, there would be payable (a) the installment premiums paid or (b) the cash surrender value, whichever is greater. Under the non-forfeiture clause, the annuitant is given an option of a reduced paid-up annuity or a cash value which is equated with "cash surrender value." There is in this regard no difference of substance between the Prudential and Mutual policies. In Mutual's policy, the term "cash surrender value" is used throughout in the non-forfeiture, loan, dividend, and settlement option clauses. The death benefits payable under its Cash Deferred Life Annuity equal premiums paid without interest; no surrender is permissible under the non-forfeiture clause; if the policy-holder defaults, he is given a lesser paid-up annuity. And Equitable's policies provide for death benefits and cancellation. The benefit, in the event of death before the annuity date, equals a cash surrender value or total premiums, whichever is greater. The cash surrender value is here termed "cash value," defined in the contract and described in the policy schedule captioned "value on surrender or lapse." This policy also provides for benefits characterized as "cash values."

Prudential's "group annuity contracts" provide for death and termination-of-employment benefits equal to the premiums paid by the employee plus interest; there is a like plan making no provision for interest.

Equitable's Non-Contributory Retirement Annuity Contract makes no provision for benefits either at death or termination of employment. Another plan provides for the same death benefits and cash values as in the Prudential contracts.

The distinctions made by plaintiffs between life insurance policies and such annuity contracts, in respect of the "mor-

tality factor" and risk, are not relevant to the fulfillment of the basic policy of the statute, N. J. S. A. 54:18A–1, 2, 3, to lay upon life insurance companies an annual tax at the rate of 2% upon the "taxable premiums collected by the company * * * under all policies or contracts of insurance on residents of this State and 1% upon the taxable considerations collected by the company * * * under annuity contracts on residents of this State," less certain franchise and other taxes.

Rescission or cancellation of an annuity contract for mistake, fraud, misrepresentation, or the like, is in a different category.

The parties themselves have provided for a cash surrender value; and their intention controls. The terms of insurance and annuity contracts are to be taken in their ordinary and popular sense, unless a technical usage is clearly indicated; and where the words have a common usage a technical construction is to be avoided, absent a compelling inference contra. Abbotts Dairies, Inc. v. Armstrong, 14 N. J. 319 (1954); Salz v. State House Commission, 18 N. J. 106 (1955); Bew v. Travelers' Insurance Co., 95 N. J. L. 533 (E. & A. 1921); Bayonne Textile Corporation v. American Federation of Silk Workers, 116 N. J. Eq. 146 (E. & A. 1934). See 29 Am. Jur., Insurance, §§ 157, 159; 50 Am. Jur., Statutes, §§ 238, 277.

The purpose of statutory construction is to bring the operation of the statute within the apparent intention of the Legislature; to this end the general intention of the law controls the interpretation of its several parts, and so general words may be restrained accordingly and words of narrower significance expanded; the essential reason of the law prevails over the literal sense of terms. The motive which led to the making of the law is the key to its understanding. It is not the words but the internal sense of the law that gives it meaning. Here, there is no ground for supposing that the Legislature had in view a "technical" rather than the common usage.

I would reverse the judgment and remand the cause for further proceedings in conformity with the foregoing considerations.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS and PROCTOR—5.

*For reversal*—Justice HEHER—1.