27 N.J. Super. 189 (1953)
98 A.2d 706
STANDARD ACCIDENT INSURANCE COMPANY, A CORPORATION, PLAINTIFF,
v.
PELLEGRINO JAMES PELLECCHIA, JR., SOMETIMES KNOWN AS JAMES PELLECCHIA OR P. JAMES PELLECCHIA, AND FEDERAL TRUST COMPANY, A CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided July 29, 1953.
*191 Mr. Louis Auerbacher, Jr., attorney for plaintiff.
Messrs. Lum, Fairlie & Foster (Mr. Charles S. Barrett, Jr., appearing), attorneys for defendant Federal Trust Company.
HUGHES, J.S.C.
This is a defense motion for summary judgment under Rule 3:56.
Plaintiff, hereinafter referred to as "Standard," issued to Columbus Trust Company, hereinafter referred to as "Columbus," certain "Bankers' Blanket bonds," hereinafter referred to as "the bond," to protect Columbus, inter alia, against loss arising from any dishonest, fraudulent or criminal act of its employees. The bond was in effect during 1946, 1947 and to about July 1948, and during its life the defendant, Pellegrino James Pellecchia, Jr., hereinafter referred to as Pellecchia, was a vice-president and also counsel for Columbus. In such capacity he handled various mortgage loan transactions for it and, chiefly by means of 20 rather substantial transactions in the names of non-existent or fictitiously involved pretended mortgagors, looted Columbus of a considerable sum, certainly in excess of $500,000. The means pursued resulted in the issuance by the appropriate Columbus officers of checks representing the proceeds of such *192 mortgage loans into the custody of Pellecchia, whereupon he falsely endorsed or forged, in the names of the non-existent or unknowing pretended borrowers (often with a plausible but false explanation of such endorsement such as "In satisfaction of lien," "For credit on purchase price," or the like), such checks to his own order. He deposited these checks to his credit in a checking account which he maintained in his individual name in the defendant Federal Trust Company, hereinafter referred to as "Federal," and Federal, having guaranteed endorsements, collected the checks from Columbus and paid the proceeds into Pellecchia's account in Federal. The money was then checked out by Pellecchia for his own purposes.
In 1948, when Pellecchia's frauds came to light, their impact caused the collapse of Columbus and on July 24, 1948, its assets were turned over to the Federal Deposit Insurance Corporation, hereinafter referred to as "FDIC." Pellecchia made partial but not extensive restitution of these thefts, was prosecuted and was sentenced to a substantial term in the New Jersey State Prison, where he now remains. FDIC called upon Standard to pay under the fidelity bond and it did pay to the extent of its liability of $200,000. At some stage of its custody of the Columbus assets, FDIC asserted a claim in excess of $500,000 against Federal based upon its guaranty of the forged or false endorsements, and this claim was included in the assets of Columbus which FDIC was administering up to the time it resold the assets to the liquidating agents of Columbus (hereinafter called the "liquidators") on September 25, 1950, although no suit had been instituted to enforce such claim.
Meanwhile, Mr. Samuel Kessler, acting as attorney for the liquidators, had been negotiating with Federal for a settlement of the claim mentioned. These negotiations were brought to a head simultaneously and on the same day Columbus bought back its assets, including the claim against Federal, for $170,994.89, the full balance then due FDIC (FDIC thus accomplishing its statutory mission to depositors and leaving the scene of action), and settled and delivered *193 its release to Commercial Casualty Insurance Company, hereinafter referred to as "Commercial" (acting for and on behalf of its principal, Federal) for $175,000. This payment was in full settlement of the much larger claim asserted by the FDIC and the liquidators against Federal on the basis of the latter's guaranty of the check endorsements. Although Standard had instituted no suit against Federal or Pellecchia (as subrogee of Columbus on the bond salvage clause hereinafter referred to, or otherwise), it did not fail to put on the record to the parties concerned that it objected to the settlement, calling attention to its rights under the salvage clause and threatening to pursue its remedies despite any such settlement.
Federal and its surety, Commercial, knew before the settlement of the asserted interest of Standard, as did the liquidators, and the latter were concerned by it and called upon Federal and its surety for protection by way of indemnity against any such later claim by Standard. In offering settlement to the liquidators on August 17, 1950, Commercial had waived on its behalf and on behalf of Federal and another irrelevantly involved bank, any claim by way of subrogation against officers, directors and stockholders of Columbus, including Pellecchia. In response to the demand by the liquidators (as a condition of their proposed settlement with Federal), for protection against the eventuality that Standard would seek to hold them as threatened, Federal, on September 6, 1950, offered a guaranty (conditioned upon, and to survive settlement of the claim against Federal) that it would indemnify, defend and hold harmless Columbus and its stockholders from any such claim by Standard. Against the possibility of loss to itself which might arise from any such claim, it retracted part of its waiver of recourse of August 17, supra, to the extent that it reserved its rights to proceed against Pellecchia in the event, and for the amount, of any such loss to it, Federal.
As stated, these transactions closed simultaneously on September 25, 1950 and the liquidators of Columbus, having repurchased the Columbus assets, eventually sold the mortgages *194 contained therein to a savings and loan association for $252,092.09 and this reduced its total loss still outstanding, claimed now (the exact amount not being crucial to decision here) to stand at $202,454.12. Standard, adhering to its forewarned dissent from the settlement, made demand on Federal for some $516,000, which Federal refused to pay or recognize.
In this setting, which I think comprises the relevant and undisputed factual background, the present suit was instituted by Standard against Pellecchia and Federal. Basic to the original complaint filed by Standard was a first count against Pellecchia, not involved in this motion, an allegation in a second and third count of Standard's liability to Columbus based on the peculations of Pellecchia, demand for and payment of Standard's obligation on the bond, the liability of Pellecchia to Columbus, the subrogation of Standard to Columbus' rights against Pellecchia, the payment by Federal to Pellecchia on the forged checks, after guaranty of the endorsements thereof, Federal's consequent liability to Columbus, Federal's knowledge and notice of the interest of Standard in any recognition of such liability to Columbus, and in the proceeds thereof, the consummation of the settlement for $175,000 of a liability far in excess of that amount, the release of Federal by the liquidators, the consequent legal nullity of such release as to Standard, and the alleged consequent liability of Federal to Standard in the amount of $200,000.
In succeeding counts of the original complaint, Standard alleged factually that, at least to the extent of $200,000, the use to which Pellecchia put the proceeds of his frauds so deposited to his credit with Federal was by checking same out in payment of gambling debts, or for gambling purposes, and under the New Jersey statute making void all transactions for such purposes, Standard charged that the withdrawal of such monies for the condemned purpose was likewise a legal nullity, binding Federal to replace such sums in the account of Pellecchia and creating liability to Standard for the same, at least to the extent of $200,000, its asserted *195 loss in the premises due to payment of its liability on the bond to Columbus.
Applying for summary dismissal of these counts and to establish certain affirmative defenses directed to them, Federal attacked such original complaint on a motion, which was heard some months ago by this court. During the course of hearing of such motion it became apparent that full discovery of evidence on the part of plaintiff had not been had and that it would be in the interest of justice to permit such discovery to enable plaintiff to attempt to establish, first, culpability on the part of Federal in connection with its handling of the Pellecchia account, which would possibly place Federal, either by actual implication, or by gross negligence equivalent thereto, in the status of a tortfeasor or participant in the frauds of Pellecchia, and second, establishing the existence of a conspiratorial plan incident to the settlement of the asserted liability of $516,000 of the liquidators against Federal for the sum of $175,000, the object thereof being to so maneuver the opposing subrogation and other rights as to extinguish any possibility that Standard could recoup its loss under the salvage clause of the bond. Accordingly, principally upon the court's motion or suggestion, the conclusive argument on the motion was deferred for a period of months until extensive discovery procedure could be pursued which has included the depositions of Pellecchia, of Ralph Pellecchia, an officer of Columbus, of Pellegrino Pellecchia, father of Pellecchia, of Mr. Cooney of Commercial, of Mr. Cooley of Federal, of Mr. Lafferty, counsel of Federal, of Mr. Kessler, counsel for the liquidators, and of Mr. Minier, an officer of the savings and loan association, which eventually bought the remnant assets of Columbus.
Upon a renewal of the motion, defendant Federal insists that upon the basis of substantive law the possibility of a factual issue which might be dispositive of the case at trial has been eliminated by the proofs before the court. Besides the depositions (the contents of which the court has considered only to the extent of evidence contained *196 therein plainly admissible and to which objections were not made during the taking thereof), the court has before it affidavits and, of course, the pleadings. The matter has been excellently briefed on both sides and it appears to the court that the fullest possible discovery has been made, which places upon the court, upon consideration of the summary motion under Rule 3:56, the responsibility to search the record of pleadings and such evidence for the existence of a triable issue of fact. In so doing, all of the facts and all reasonable inferences and implications thereof must be considered most strongly in favor of the plaintiff and in derogation of summary disposition, for that is a drastic remedy. Evangelista v. Public Service Coordinated Transport, 7 N.J. Super. 164 (App. Div. 1950); Baldwin Construction Co. v. Essex County Board of Taxation, 24 N.J. Super. 252 (Law Div. 1952).
Despite the tolerance and breadth of scope with which the pleadings and proofs must be viewed on this type of summary examination before the drastic relief invoked by the Rule 3:56 motion is granted, it is clear that a mere complication of issues may not relieve the court of its responsibility to see that if the movant is substantially entitled to the relief sought, it is granted to it. In other words, Rule 3:56 imports, as did its predecessor motions or demurrers in the very lengthy past, a realness of legal right, despite the caution with which the courts are exhorted to hedge the granting of such remedy.
So conceived, it is apparent that a critical analysis of the pleadings and proofs must relate to and be based upon a clear understanding of the legal issues involved. In this sense, it seems to me that there has been some little confusion, in which the court frankly admits its participation thus far, in the two categories of events here involved. The first such area of fact must necessarily precede the events of September 25, 1950, on which date occurred steps to which a singular import is attributed by the plaintiff, i.e., the repurchase of the FDIC-held Columbus assets and the simultaneous settlement of the claim of the liquidators against *197 Federal. The burden of plaintiff's argument attributes to these events (at least I have understood it so) a wrongness which in first examination might be understood to express two concepts:  (1) that, at the least, such compact of release was a legal nullity, ineffective to extinguish Standard's existing right against Federal, and (2) that in some manner it created in itself a cause of action against Federal. I think the second of these implications may be discarded at the outset for I cannot conceive of the possibility that if Standard was not theretofore the possessor of rights against Federal, it became so as a result of the settlement, and this despite any wrongness of motive in ignoring its known objections thereto, in effecting the settlement. The emphasis placed upon the coincidence of the repurchase of the Columbus assets and the Federal settlement, the suggestion that Federal engineered such transaction with its eye chiefly upon the claim against itself as the most attractive of such assets, the hint that it contemplated a release of its rights against Pellecchia, to have effect upon his chances of parole, and similar probings, all seem to me as intended to embellish by a suggestion of legal immorality the fact of the settlement itself. But if a substantial right of subrogation inhered in Standard before such event, the naked settlement, the parties being conscious of Standard's position, though entered into in the highest good faith, would be abortive as within our cases typified by Fire Association of Philadelphia v. Wells, 84 N.J. Eq. 484 (E. & A. 1915), for the reason that such release in itself, even without wrongful actual intent, would be a legal fraud against the subrogee and of no advantage to the participant tortfeasor.
There is a third possibility to which these criticisms of the settlement may be directed, that is, to the destruction by inequitable conduct of possible superior or equivalent equities of Federal to those of Standard. The proportion of equities is of crucial relevance to the primary right of subrogation, but I leave this point until later, after consideration of the fundamental status of Standard's rights against Federal.
*198 In that regard, it is conceded that, with some qualifications, an insurer on payment of a loss, acquires the right to be subrogated pro tanto to any right of action which the insured may have against any third person whose wrongful act or neglect caused the loss. This general rule extends to contracts of fidelity guaranty equivalent to the bond sub judice. The obligee of a fidelity bond is said to have the right to protect its insurer by extending to it the right of subrogation, if indeed that is needed for the right to exist.
Thus a fidelity insurer or guarantor, by paying the obligee on the bond for the loss sustained by the wrongful act of the person bonded, becomes entitled to subrogation to any cause of action existing in favor of the obligee against a third person who has not acted in good faith and with due care and who was chargeable with notice of the principal's impending default. This right of the surety, moreover, to subrogation is generally conceded to exist without the need of assignment of the obligee's rights to it, for the combination of events creating the equitable right to subrogation is deemed in itself to work an equitable assignment of the obligee's right of recourse against the third person.
Subrogation is said to be a doctrine of purely equitable origin and nature. Since it is an equity, it is subject to the rules governing equities, and will not be enforced where it would be inequitable to do so. It will not be allowed to work injustice to others having equal or superior equities. The right of subrogation must be founded upon an equity just and reasonable according to general principles  an equity that will accomplish complete justice between the parties to the controversy. It is a device adopted by equity to compel the ultimate discharge of an obligation by him who in good conscience ought to pay it. Camden Trust Co. v. Cramer, 136 N.J. Eq. 261 (E. & A. 1945).
There is little variance in the precedents concerning the equitable origin of this right, and similarly, that its enforceability is dependent upon the particular facts and circumstances of each case. It will not be enforced where it would work injustice to the rights of those having equal *199 or superior equities. The right of subrogation, moreover, is not coextensive with the right of the obligee for it has been withheld in many cases involving sureties who, having indemnified the obligee for the loss suffered by him as a result of the principal's default, seek recovery, in the right of the obligee, against a third person who was liable to the obligee for the same debt or obligation which the surety has discharged. This is not to say that it is not enforceable against any such third person who lacks countervailing equities, for the majority rule keys the existence of the right to the absence of an equal or superior equity in the one against whom the right would be enforced. In some jurisdictions the right goes even against those possessing superior or equal equities, but this latter rule is not the weight of authority, which denies the surety relief by way of subrogation against the possessor of superior or equal equities.
Where the equities of such third person in respect to the payment of the liability in question are equal or superior to those of one who has paid such liability, the latter will not by subrogation to the right of the obligee be allowed to recover against the former. To allow him to recover under the doctrine of subrogation, something more must be shown than that he discharged a liability for which such third person was also liable to the obligee.
Now this "something more" includes, of course, tortfeasance and conduct in the nature thereof, including fraud, negligence, culpable knowledge, conspiratorial participation, implied knowledge or even omission of duty. Where the third person is actually blameless in this sense, although contractually liable to the obligee, he is said to possess an equity equal or superior to that of a paid surety, for instance. Thus it will be noticed that there are two lines of authorities, one importing absolute enforceability of the subrogation right, regardless of circumstance, such as National Surety Co. v. National City Bank, 184 App. Div. 771, 172 N.Y.S. 413 (1918), and other cases cited by Standard, and what appears to me to be the much greater weight of authority as typified by Meyers v. Bank of America, 11 Cal.2d 92, 77 P.2d 1084 *200 (Sup. Ct. 1938); American Surety Co. v. Bank of California, 133 F.2d 160 (C.C.A. 9 1943); and U.S. Fidelity & Guaranty Co. v. First National Bank in Dallas, Tex., 172 F.2d 258 (C.C.A. 5 1949). In the American Surety Co. case, supra [133 F.2d 163], Judge Stephens cites examples of instances in which a bank (in Federal's position here) should have made inquiry, or was put on notice of potential dereliction, or was otherwise negligent. These elements make the bank, in such case, a participant in the principal's default and import a liability distinguishable in equity from the mere contractual obligation to pay out a depositor's money only where properly drawn, or (as here) in support of the integrity of antecedent endorsements. He puts the distinction in these words:
"In all of the situations outlined defendants had actual knowledge of facts sufficient to put them on notice of the wrongdoing and in a way, therefore, were implicated in the wrong done. In the instant case Bank was liable, if at all, not because it was a wrongdoer but because of its absolute liability on an implied contract to repay money on deposit only to the persons to whose order the checks are drawn."
I adhere to the majority view and with it in mind I have scrutinized this record to find some suggestion that the involvement of Federal transcended its naked contractual liability on the guaranty of endorsements. I have found none, even the slight overtones of suspicion which ought to have inspired it to caution. Pellecchia, as widely and almost judicially known, was a member of the bar of New Jersey and a judge. He was a bank officer whose routine authority was never questioned. The checks and the explanatory endorsements of many of them were in harmony with normal business course. They were paid without protest. They were obviously the proceeds of mortgage transactions usually bottomed upon investigation, searching of titles, personal execution of instruments and the like. The conduct of Columbus in its dealings on the mortgage loans vouched for the integrity of this trusted representative. His fall from public esteem was catastrophic. Consciously exerting myself *201 to a breadth of view in favor of plaintiff Standard, as I must on this motion, I discern no fact nor inference importing to Federal implication of any kind, even of ordinary negligence, in Pellecchia's wrongdoing.
Applying the rule of subrogation, Federal, then, was innocent in the equitable sense, and its equity being equal or superior to that of Standard, it had no basic liability to Standard in the first instance. The right of subrogation of Standard against the principal, Pellecchia, is absolute, but that against Federal is conditional, and the condition, namely, a superior equity to that of Federal, is nowhere demonstrated in the pleadings, proofs or inferences therefrom. This balancing of equities, and the result in equity, is well stated in Meyers v. Bank of America, supra [11 Cal.2d 92, 77 P.2d 1089]:
"As stated hereinbefore, the right to maintain an action of this kind and to a recovery thereunder involves a consideration of, and must necessarily depend upon the respective equities of the parties. Here, the indemnitor has discharged its primary contract liability. It has paid what it contracted to pay, and has retained to its own use the premiums and benefits of such contract. It now seeks to recover from the bank the amount thus paid. It must be conceded that the bank is an innocent third party, whose duty to the employer was based upon an entirely different theory of contract, with which the indemnitor was not in privity. Neither the indemnitor nor the bank was the wrongdoer, but by independent contract obligation each was liable to the employer. In equity, it cannot be said that the satisfaction by the bonding company of its primary liability should entitle it to recover against the bank upon a totally different liability. The bank, not being a wrongdoer, but in the ordinary course of banking business, paid money upon these checks, the genuineness of which it had no reason to doubt, and from which it received no benefits. The primary cause of the loss was the forgeries committed by the employee, whose integrity was at least impliedly vouched for by his employer to the bank. We cannot say that as between the bank and the paid indemnitor, the bank should stand the loss."
Believing and determining, then, that there was no basic right of subrogation in Standard against Federal, I turn to the events leading to the settlement of September 25, 1950. Standard urges that Federal, having improved its *202 position by the settlement, is in no position to assert equal or superior equities to Standard in derogation of the right of subrogation which Standard would otherwise have. Among other things, it points to the indemnification of the liquidators by Federal against the threatened claim of Standard; Federal's conditional renunciation of recourse against Pellecchia; Federal's providing of the wherewithal for the repurchase from FDIC of the Columbus assets; the alleged absolute liability of Federal to the liquidators on the guaranty of endorsements exceeding $500,000, and the consequent disparity and suspicion attaching to the smaller settlement thereof for $175,000, and other items smacking, at least, of adroit legal maneuvering. Examining the whole of the proofs, it seems clear to me that while the apparent liability of Federal on the guaranty of endorsements was absolute, a very substantial jury question would have been presented, inter alia, by the culpable overconfidence of Columbus in Pellecchia; that the settlement was fair in its essence and establishes no basis for a belief in any ulterior motive. None of these circumstances, to my mind, destroy the basic equities inhering in Federal apart from the settlement. They neither nullify the compact of settlement as fraudulent, nor do they deplete the equities possessed at the outset by Federal.
It remains to discuss the theory that the somewhat drastic New Jersey statute concerning gambling should be applied to bring about the following result:  that since transactions including checks paid in connection with gambling are made absolutely void by such statute, N.J.S. 2A:40-3 et seq., the payment of gambling checks issued by Pellecchia out of his checking account should be regarded as a nullity Federal should be required to replace such funds in his account and in turn, Standard should be entitled to recover such funds. Our courts have indeed given rigid effect to the gambling statute, going so far as to oust a subsequent holder in due course of his right to recover thereon, and divorcing such instruments from the provisions of the Negotiable Instruments Law. Fisher v. Brehm, 100 N.J.L. 341 (E. & A. 1924). This furthest reach of *203 application of the New Jersey condemnation of gambling transactions, however, cannot avail Standard in the instant matter because there was there involved a check in esse, the enforcement of which would have run counter to the public policy basic to the statute. No such result could arise here because such public policy is not involved. The transactions are too far removed now from scrutiny to involve such public policy. A different rule would imperil all business life and indeed, it is difficult to imagine what stability could exist so far as titles to homes and other property in New Jersey are involved, for instance, if the remote genesis of payments could be recalled for the purpose advanced by Standard here.
I have not touched upon, as being unnecessary to decision, questions involving election of remedies or election of rights which have been advanced by the movant.
These considerations lead me to the conclusion that the defendant Federal is entitled to summary dismissal of those counts in the amended complaint involving it and to summary judgment on the whole case, since in my view it has been demonstrated "palpably that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment * * * as a matter of law." Rule 3:56.
An order for the granting of its motion should be presented by counsel, on notice or on consent as to form.