THOMAS H. JUDSON, JR., AND WILLIAM RUSSELL JUDSON, TRUSTEES, ETC., *ET AL.*, PLAINTIFFS-APPELLANTS, v. PEOPLES BANK AND TRUST COMPANY OF WESTFIELD, *ET AL.*, DEFENDANTS-RESPONDENTS.

Argued October 18, 1954—Reargued November 15, 1954— Decided December 13, 1954.

70

71

*Mr. Joseph A. Weisman* argued the cause for appellants (*Messrs. Weisman & Freedman,* attorneys).

*Mr. Walter J. Bilder* argued the cause for respondent Bankers Commercial Corporation (*Messrs. Bilder, Bilder & Kaufman,* attorneys; *Mr. Walter J. Bilder* on the brief).

The opinion of the court was delivered by
WILLIAM J. BRENNAN, JR., J. Plaintiffs' complaint alleges that the five defendants fraudulently conspired to oust them from control of Tuttle Brothers, Inc., a New Jersey corporation doing business in Westfield, by inducing them to part with their common voting stock, over 90% of the outstanding shares, at an unconscionable price less than a tenth of its value.

Plaintiffs accepted $2,500 from two of the defendants, Peoples Bank and Trust Company of Westfield and the estate of Charles M. Smith (Smith had been an officer of the bank, which is the executor of his will), and consent judgments of dismissal were entered as to them. Summary judgments were thereafter entered in favor of the remaining defendants, Bankers Commercial Corporation, John C. Evans and the Sturdy Company, a New Jersey corporation solely owned by said Evans. The appeal is from the summary judgments and was certified here of our own motion while pending in the Appellate Division.

Summary judgment was granted first to Bankers Commercial Corporation (which we shall designate "Bankers")

upon its motion based on a supporting affidavit of the president of Peoples Bank and Trust Company and "the pleadings and papers on file," which included the depositions of plaintiff Thomas H. Judson, Jr., of the defendant John C. Evans, and of Raymond J. Conlan, a vice-president of Bankers, together with a comprehensive pretrial order and the mentioned judgments of dismissal. In an opinion filed by the trial judge two grounds were given, *first,* that the allegations as to Bankers "cannot be sustained because they are untrue. This defendant did not conspire with the other defendants to unlawfully wrest control of Tuttle from the plaintiffs"; and, *second,* that the settlement with Peoples Bank and Trust Company and the Estate of Charles M. Smith, in the form taken, operated as an acceptance of satisfaction discharging all defendants.

After the opinion was filed, defendants John C. Evans and the Sturdy Company moved for and were granted summary judgments, apparently upon the second ground.

## I

The summary judgment in Bankers' favor is not supportable upon the first ground. We consider that the trial judge improperly decided from conflicting proofs the material fact of Bankers' participation in the allegedly fraudulent scheme and thus misconceived the judicial function in the summary judgment procedure. The role of the judge in that procedure is to determine whether there is a genuine issue as to a material fact, but not to decide the issue if he finds it to exist. See *Asbill and Snell, Summary Judgment Under the Federal Rules,* 51 *Mich. L. Rev.,* 1143, 1155 (1953).

The summary judgment procedure was first introduced in England in 1855 and in New Jersey, among the first of the states, in our Practice Act of 1912. *Clark and Samenov, The Summary Judgment,* 38 *Yale L. J.* 423, 424, 442 (1929). Originally restricted to creditor claimants suing to recover upon liquidated debts and demands, modern pro-

cedural systems, particularly those like New Jersey's, modeled upon the *Federal Rules of Civil Procedure*, 28 *U. S. C. A.*, make summary judgment procedure available in any civil action and to claimants and defending parties alike. *R. R.* 4:58. It is designed to provide a prompt, businesslike and inexpensive method of disposing of any cause which a discriminating search of the merits in the pleadings, depositions and admissions on file, together with the affidavits submitted on the motion clearly shows not to present any genuine issue of material fact requiring disposition at a trial. *Shientag*, 4 *Ford. L. Rev.* 186 (1935). In conjunction with the pretrial discovery and pretrial conference procedures, the summary judgment procedure aims at "the swift uncovering of the merits and either their effective disposition or their advancement toward prompt resolution by trial." *Clark, The Summary Judgment*, 36 *Minn. L. Rev.* 567, 579 (1952). Even when a case for summary judgment is not made out, the procedure can be a valuable adjunct to pretrial conference procedure when, as may be done under *R. R.* 4:58–4, there results an order specifying the facts that exist without substantial controversy and directing such further proceedings in the action as are just. *Cooper v. Jeter*, 17 *N. J. Super.* 180 (*Cty. Ct.* 1951).

The standards of decision governing the grant or denial of a summary judgment emphasize that a party opposing a motion is not to be denied a trial unless the moving party sustains the burden of showing clearly the absence of a genuine issue of material fact. At the same time, the standards are to be applied with discriminating care so as not to defeat a summary judgment if the movant is justly entitled to one.

Thus it is the movant's burden to exclude any reasonable doubt as to the existence of any genuine issue of material fact, 6 *Moore's Federal Practice, par.* 56.15(3). The phrasing of our rule, *R. R.* 4:58–3, slightly different from *Federal Rule* 56(c), underscores this in the requirement that the absence of undisputed material facts must appear "palpably."

All inferences of doubt are drawn against the movant in favor of the opponent of the motion. The papers supporting the motion are closely scrutinized and the opposing papers indulgently treated, *Templeton v. Borough of Glen Rock*, 11 *N. J. Super.* 1, 4 (*App. Div.* 1950). And it is not to be concluded that palpably no genuine issue as to any material fact exists solely because the evidence opposing the claimed fact strikes the judge as being incredible. *Arnstein v. Porter*, 154 *F. 2d* 464, 469 (*C. C. A.* 2 1946). Issues of credibility are ordinarily for the trier of fact, and the judge does not function as a trier of fact in determining a motion for summary judgment. Where the judge questions the inherent credibility of the matter offered in opposition there are other alternatives to the rejection of the matter and the grant of the motion. Under *R. R.* 4:58–5 "leave to proceed may be given unconditionally, or upon such terms as to giving security, or time or mode of trial, or otherwise, as may be deemed just."

However, if the opposing party offers no affidavits or matter in opposition, or only facts which are immaterial or of an insubstantial nature, a mere scintilla, 5 *Vanderbilt L. Rev.* 607, 613 (1952), "fanciful, frivolous, gauzy or merely suspicious," 6 *Moore, Federal Practice, par.* 56.13(3), he will not be heard to complain if the court grants summary judgment, taking as true the statement of uncontradicted facts in the papers relied upon by the moving party, such papers themselves not otherwise showing the existence of an issue of material fact. *Taub v. Taub*, 9 *N. J. Super.* 219 (*App. Div.* 1950); *Lauchert v. American S. S. Co.*, 65 *F. Supp.* 703, 707 (*D. C. W. D. N. Y.* 1946). Nor is summary judgment to be denied if other papers pertinent to the motion show palpably the absence of any issue of material fact, although the allegations of the pleadings, standing alone, may raise such an issue. Summary judgment procedure pierces the allegations of the pleadings to show that the facts are otherwise than as alleged. *Wade v. Six Park View Corp.*, 27 *N. J. Super.* 469 (*App. Div.* 1953).

Where, as here, the opposing party charges the moving party with willful fraud and must probe the conscience of the moving party (or its officers, when, as here, a corporation) to prove his case, or in any case where the subjective elements of willfulness, intent or good faith of the moving party are material to the claim or defense of the opposing party, a conclusion from papers alone that palpably there exists no genuine issue of material fact will ordinarily be very difficult to sustain. The telltale factor of demeanor in the presence of the trier of fact often assumes such vital importance in such cases that the opposing party should generally not be denied the opportunity to have the moving party, or its officers, appear on the witness stand before the trier of fact. *Cf. Cooper v. Jeter, supra; Hummel v. Riordon*, 56 *F. Supp.* 983, 987 (*D. C. N. D. E. D. Ill.* 1944); *Mayflower Industries v. Thor Corp.*, 15 *N. J. Super.* 139, 155 (*Ch. Div.* 1951). Indeed, subjective elements aside, a note of caution has been sounded as to any case where the opposing party must prove his claim or defense from what he can draw from the other party. *Bozant v. Bank of New York*, 156 *F.* 2d 787, 790 (*C. C. A.* 2 1946). On the other hand, it should be noted that *R. R.* 4:58–7 dealing with such situations provides that "should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may deny the motion or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had, or may make such other order as is just." Plainly, the rule contemplates that a denial of the motion for summary judgment is not always to be the result. The motion may be held and decided after the opposing party has availed himself of an opportunity to develop through affidavits or depositions material necessary to justify his opposition. This expedient has been adopted even in fraud cases. *Peckham v. Ronrico Corp.*, 7 *F. R. D.* 324 (*D. C. P. R.* 1947), reversed on other grounds 171 *F.* 2d 653 (*C. C. A.* 1, 1948); *cf. Standard Accident Insurance*

*Co. v. Pellecchia,* 27 *N. J. Super.* 189, 195 (*Law Div.* 1953), reversed 15 *N. J.* 162 (1954); see also 51 *Mich. L. Rev., supra, p.* 1170.

Both this court and the Appellate Division, *Templeton v. Borough of Glen Rock, supra,* have been constrained to remark the disproportionate number of reversals of summary judgment made necessary on appeal by the failure to observe the limits of the form and purpose of the procedure. In such cases it is manifest that the ends the procedure is designed to serve are defeated. Time is lost and not saved and expenses are added, not avoided. Commentators upon experience under the federal rule have made kindred observations. *Doehler Metal Furniture Co. v. United States,* 149 *F. 2d* 130, 135 (*C. C. A.* 2 1945). These undesirable results may be easily avoided, suggests Judge Clark, 36 *Minn. L. Rev., supra,* 579, through recognition that in reaching decision upon a motion for summary judgment

"* * * What is needed is the application of common sense, good judgment, and decisive action, on the one hand, not to shut a deserving litigant from his trial and, on the other, not to allow harassment of an equally deserving suitor for immediate relief by a long and worthless trial."

To which Asbill and Snell, at 51 *Mich. L. Rev., supra,* 1172, add:

"If these general rules are applied by the courts with discernment and care, the summary judgment procedure, without unjustly depriving a party of a trial, can effectively eliminate from crowded court calendars cases in which a trial would serve no useful purpose and cases in which the threat of a trial is used to coerce a settlement."

## II

From the facts and the inferences therefrom in plaintiffs' favor to be drawn from this record, it plainly appears that the trial judge erred in resting the summary judgment in Bankers' favor upon the first ground given to support the determination.

Plaintiffs in 1945 owned 2370 of the 2578 outstanding shares of common voting stock of Tuttle Brothers, Inc. (which we will designate "Tuttle company"). There was also an outstanding preferred non-voting class of stock. During the depression, in 1935, the Tuttle company had given a $240,000 mortgage jointly to the defendant Peoples Bank and Trust Company and another bank, The Westfield Trust Company, now defunct and being liquidated by the Federal Deposit Insurance Company. Plaintiff Thomas H. Judson, Jr., was the president and defendant John C. Evans the treasurer of the Tuttle company when the mortgage was placed. Evans owned only 123 shares of the common stock and no preferred.

In 1941 defendant Peoples Bank and Trust Company was dissatisfied with the Tuttle company management and, to protect its loan, required the company to submit to the direction and supervision of the business by one of the bank's own officers, the late Charles M. Smith. Evans found favor in Smith's eyes and became his right-hand man, taking on the responsibility for the conduct of the business under Smith's direction. In 1942 Smith had plaintiff Thomas H. Judson, Jr., step down from the presidency to be replaced by Evans. To Evans, however, Smith remained "the boss" who "called the tune."

The company prospered on war orders and in 1944 earned $64,960, equivalent to $25 per share of common stock, and had a book net worth of $466,415, or about $160 per common share.

Evans became unhappy with his lot. He complained to Smith that he was doing all the work and the stockholders were getting all the profit. He threatened to quit to start his own business. Smith persuaded him to stay, with the promise that he, Smith, would try to work out a plan for Evans to get the Tuttle company business. He told Evans that the plaintiffs must not learn what was afoot because they would not favor having Evans in control. Everyone thereafter concerned with the plan kept the secret so well

that plaintiffs did not learn that Evans had become sole owner of the company until five years later when the company was in bankruptcy and Evans disclosed the details during examination of him before a referee in bankruptcy.

Plaintiff Thomas H. Judson, Jr., was the spokesman for the other plaintiff members of his family. It is not clear from the record just when Smith began to put pressure on Judson to have the family sell their common stock. The fair inference is that, if it began earlier, it increased in intensity when Evans, apparently early in March 1945, interested a New York lawyer, Rager, to organize a syndicate to raise $100,000 to buy out both the preferred and common stock. That sum would provide about $15 per common share. Evans had no means of his own and Rager agreed to loan him $20,000 with which to purchase a 20% interest in the syndicate.

The trier of fact might reasonably find that Smith's campaign to get the plaintiffs to sell was grounded upon deliberate false representations. Judson held Smith in the highest regard and greatly admired his business judgment. In Judson's words, "I trusted Mr. Smith more than I have ever trusted any other man in my life." Smith's story to Judson, contrary to the fact, was that a wealthy friend of Smith wanted to buy a business for his son. Smith told Judson that this was a wonderful opportunity for the family to get out, that with the war's end the business was sure to come on hard times and the banks, his own and the Federal Deposit Insurance Company, would "close in" leaving the stockholders nothing. He analyzed the balance sheet item by item and told Judson in effect that the book values were grossly inflated and certainly would not realize anything in excess of the $186,000 then due the banks on the mortgage. He counselled Judson, "You boys will get nothing if you don't take this. You better take the $15 and run. That is the best I can do for you."

Trusting Smith and believing he was acting the part of friend of the family, Judson and the other members of the

family executed 60-day options, dated March 24, running to Rager, ostensibly the representative of Smith's "wealthy friend," to sell their common stock at $15 per share.

It soon occurred to Evans that with only a minority interest in the Rager syndicate his own position would not be at all improved. He and Smith discussed this and decided to try to get out of the Rager arrangement and work up something else. Rager agreed to cancel the plan upon a payment of $5,000. Smith and Evans caused the Tuttle company to pay that sum under the guise of compensation for legal services, although Rager had in fact rendered no legal service to the company, and on May 18 Rager surrendered the options.

Meanwhile Smith was working on Judson to get new options. He succeeded in obtaining the first on May 19 and the rest under date of May 24. The trier of fact could readily infer that Smith initiated the conversations with Judson for the new options sometime before May 18. Smith told Judson he was substituting for Rager as the representative of the "wealthy friend," and the new options ran to him, expiring originally on June 8, but later they were extended to July 9.

We come now to Bankers' part in the picture. Bankers had financed the Tuttle company's accounts receivable for upwards of 20 years. Evans had close personal relations for much of that time with executives of Bankers' New York office and in particular, at least from the time he assumed the presidency of the Tuttle company, with a vice-president named Langhans. Evans says in his deposition that after he and Smith decided not to go through with the Rager deal he asked Langhans if Bankers could help him out. It may reasonably be inferred from his testimony that this was before May 18, because he said that Langhans after devising the plan ultimately effected told him that nothing could or would be done until the Rager options were disposed of or expired. It may also reasonably be inferred that it was because Langhans, before May 18, committed Bankers to help only if the Rager options were out of the way that

Smith and Evans were willing on that date to pay Rager $5,000 from the Tuttle company's funds for the cancellation of Rager's options.

Langhans' plan was ideally suited for Evans' purposes. According to Evans, Langhans proposed that Bankers buy all the outstanding preferred and common stock except Evans' 123 common shares and make a contract to resell it to Evans' company, the Sturdy Company, at a $5,000 profit to Bankers. The Sturdy Company had no assets, and the money to pay Bankers was to come from the Tuttle company. In addition to the price to be paid Bankers for the stock, $90,442.17 as it finally developed, it was also necessary to pay the Federal Deposit Insurance Company $13,470 for a release from lien of some of the common stock held by it as additional security for the mortgage. Parenthetically, the defendant Peoples Bank and Trust Company held an equal number of shares subject to a like lien but released them without payment. It is obviously permissible to assume that Smith had a hand in that decision. Smith was also to be paid and was paid $5,000 for his services. But the Tuttle company, while it had sizeable cash balances in hand, could not pay out the large aggregate sum of $108,912.17 without embarrassing its working capital. Langhans agreed to have Bankers loan the Tuttle company $54,000 on the security of a chattel mortgage, and it may be legitimately assumed that the purpose was to assure that the Tuttle company would have sufficient cash in hand to finance the stock deal without impairing working capital.

On July 6 Smith formally assigned the options to Bankers, and on July 9 Evans' attorney telegraphed Judson that the options would be exercised but that, at the insistence of Federal Deposit Insurance Company, the closing date was to be deferred until July 27.

Meanwhile Langhans went on vacation and turned the matter over to another Bankers vice-president, the said Raymond J. Conlan, to complete the transaction.

Conlan prepared the chattel mortgage to secure the $54,000 loan, and that arrangement was closed on July 26. On July 27 Conlan went to the office of Peoples Bank and Trust Company in Westfield with a check of Bankers for $85,300, drawn on its account with said Peoples Bank and Trust Company and made payable to that bank's order. He exchanged the check for certificates representing all the outstanding preferred and common stock of the Tuttle company except the 123 shares of common stock held by Evans.

Ten days later, on August 6, Bankers and the Sturdy Company signed the resale agreement. It called for a $40,000 payment immediately and payment of the balance in installments by October 2, less than 60 days later, Bankers to hold the stock meanwhile. The payments were promptly made, in each instance immediately after the amount of the payment had been advanced by the Tuttle company to the Sturdy Company. In October Bankers released the stock to the Sturdy Company. The Sturdy Company in turn surrendered the stock to the Tuttle company where it became treasury stock.

Thus Evans, without putting up a penny, wound up the holder of the company's only outstanding stock. Smith had his $5,000 fee, and Bankers its investment repaid within 60 days with a $5,000 profit plus the earnings on the $54,000 chattel mortgage which was duly paid off by the Tuttle company according to its terms.

Plaintiffs concede that Bankers did not enter the picture until after Smith's fraudulent representations to Judson had resulted in the execution of the Rager options. The theory upon which plaintiffs would hold Bankers liable for the results of the fraud is that Bankers understandingly connected itself with the conspiracy of Smith and Evans to defraud the plaintiffs and made possible the accomplishment of the fraudulent scheme.

This theory of tort liability is recognized in our cases. The gist of the action is not the conspiracy charged but the tort working damage to the plaintiffs. Those who are not

parties to the fraudulent plan when it is concocted but who join in promoting its accomplishment are equally liable for the resulting damage, *Den ex dem. Stewart v. Johnson,* 18 *N. J. L.* 87 *(Sup. Ct.* 1840); *Landriani v. Lake Mohawk Country Club,* 26 *N. J. Super.* 157 *(App. Div.* 1953); see also *Van Horn v. Van Horn,* 56 *N. J. L.* 318 *(E. & A.* 1893), *Louis Kamm, Inc., v. Flink,* 113 *N. J. L.* 582 *(E. & A.* 1934). Prosser labels the theory one of "vicarious liability for a tortious act," *Prosser, Torts, sec.* 109, *pp.* 1092 *et seq.* (1941).

Our recital of the salient facts and inferences therefrom is made in the light of the principles outlined above imposing upon Bankers the burden to show the absence of any genuine issue of fact and requiring the close scrutiny of the papers in support of the motion and the resolution of all inferences of doubt in favor of the plaintiffs. Particular emphasis is given to the depositions of Judson and Evans and to the inferences which may fairly be drawn from the documentary proofs. This is because together they, without more, reveal the existence of a genuine issue of fact as to the extent of Bankers' participation, entitling plaintiffs to the opportunity more fully to develop their contention at a trial. It is true that the testimony of Evans and the inferences drawn from the documentary proofs are contradicted in virtually every particular by the testimony of Conlan, the Bankers vice-president, in his deposition. Conlan swore that Evans never approached Langhans until after the middle of July. Upon that premise Conlan sought to show in effect that Bankers did not know and could not possibly have known or have had reason to know of the Smith and Evans plan or even of the Rager arrangements. The error into which the trial court fell was in deciding the disputed question by accepting Conlan's testimony as true. Properly considered upon the motion for summary judgment, Conlan's testimony, laid beside that of Evans and the documentary proofs, should have persuaded the trial judge that there appeared beyond peradventure the

existence of the genuine issue of fact as to the extent of Bankers' participation in the fraudulent scheme concocted by Smith and Evans. In that circumstance the denial of Bankers' motion was compelled. The trial judge could not, as he did, assume the role of trier of the disputed fact and decide it. The test is not whether the papers show that the opposing party has proved his case or even that he has made out a *prima facie* case. The proofs which are to be evaluated for those purposes are the proofs offered at the trial. Here, for example, Langhans' deposition was not taken. The importance of his testimony on the vital question of Bankers' participation is obvious. Since the existence of the issue of what that participation was already plainly appears from what is now in the record, Langhans' deposition was not necessary to establish the point. Plaintiffs, however, are entitled to a trial more fully to develop their contentions in that regard through Langhans' testimony or otherwise as they can.

The plaintiffs' brief stresses the argument that, apart from all other proofs and even assuming Bankers' participation began in the middle of July, Bankers must be held chargeable for fraud because it must have known the $15 price was unconscionable, this from its complete familiarity with the Tuttle company's financial affairs, gained from the periodic audits of the Tuttle company books made by Bankers' auditors over the years in connection with its financing of Tuttle company's accounts receivable. Standing alone, that conclusion would not be justified, we think, if Conlan's version of Bankers' participation is accepted by the trier of fact. In such case Bankers might properly look upon the $15 price for the common stock as simply a good bargain made by Evans. The evidence implies the suggested significance only when integrated with the mosaic of proofs implying Bankers' participation and knowledge before the Rager options ran out.

### III

We deal next with the question whether the three summary judgments are supportable on the second ground taken by the trial judge on the Bankers motion, namely, that as a matter of law the settlement with Peoples Bank and Trust Company and the Charles M. Smith Estate, and the dismissals of the action against them, constituted satisfaction discharging plaintiffs' claim. We think the summary judgments are likewise not supportable upon that ground.

Rooted in the sound and just principle that there may be but one satisfaction for a tortious wrong, the acceptance of satisfaction by the injured person from one of several wrongdoers responsible for the wrong discharges all of them. *Moss v. Cherdak*, 114 *N. J. L.* 332 (*E. & A.* 1935). But "whether the settlement is made and accepted as full satisfaction or merely as the best obtainable compromise for the settler's liability is the crucial issue, and ordinarily one of fact." *McKenna v. Austin*, 77 *U. S. App. D. C.* 228, 134 *F. 2d* 659, 664, 148 *A. L. R.* 1253 (*App. D. C.* 1943). At common law an unqualified release given by the injured person to one of two or more tortfeasors conclusively evidences satisfaction and operates automatically to discharge the others (*cf.*, however, *LaMonte v. Mott*, 93 *N. J. Eq.* 229, 249 (*E. & A.* 1921)), but that result is avoided if the injured party gives a covenant not to sue or a release expressly reserving rights to proceed against the others. *Roseville Trust Co. v. Mott*, 85 *N. J. Eq.* 297 (*Ch.* 1915); *Brandstein v. Ironbound Transportation Co.*, 112 *N. J. L.* 585 (*E. & A.* 1934); *Annotations*, 124 *A. L. R.* 1298 (1940), 148 *A. L. R.* 1270 (1944). Our recently enacted Joint Tortfeasors Contribution Law of 1952, *N. J. S.* 2A:53A–1 *et seq.*, has not obliterated this distinction between the effect of a release and the effect of a covenant not to sue or a release reserving rights against the other tortfeasors; our Legislature did not include in the statute sections 4 and 5 of the draft Uniform Contribution among Tortfeasors Act, 9

*U. L. A., p.* 156 *etc.,* providing that even an outright release is to be treated as a covenant not to sue and not to discharge the other tortfeasors unless the release so provides. It remains the law in this State that the injured person's right, after settling with one tortfeasor, to go against the others will usually depend upon whether the settling tortfeasors are given an outright release or a covenant not to sue, or a release reserving rights against the others.

But no release or covenant not to sue was given by plaintiffs to the settling defendants in this case. The settlement was effected by the entry of consent orders of dismissal reciting that "the matters in dispute between said plaintiffs and the defendant" [naming the defendant] having "been amicably adjusted," it is "ordered that the complaint and amended complaint filed herein * * * be dismissed with prejudice as to the defendant * * * without costs; *but without prejudice on the part of the aforesaid plaintiffs to continue the prosecution of the action against all other defendants."* (Emphasis supplied)

The trial court held, and Bankers argues here, that the reservations in the orders are to be ignored and that the orders are to be deemed, in law, determinations that the liability alleged against all defendants was fully satisfied by the $2,500 payment received from the two settlers, this on the authority of an opinion of the former Circuit Court in *Vallani v. Damiano,* 9 *N. J. Misc.* 290 (1931). In the *Vallani* case, however, the consent judgment against one of the two tortfeasors expressly determined both that the defendant was liable for the tort and also, of controlling significance on the question under discussion, "that the amount of the judgment is the amount of the damage done by the tort." It was not until after the judgment in that form was entered that it was amended to have it appear "that the parties did not intend that the judgment should be satisfaction." The amendment was held to be ineffective in face of the plain language of the original judgment to the contrary. The payment of the judgment was therefore held to constitute full satisfaction of the plaintiff's claim.

The instant orders of dismissal are hardly comparable. Apart from the fact that the damages claimed are $315,000 (the difference between the alleged value of the stock and the $35,550 received at $15 per share), the orders contain nothing even slightly suggesting that the $2,500 received was agreed by plaintiffs to represent the amount of the damage actually suffered by them. Bankers stresses the recital that the matters in dispute "have been amicably adjusted" as importing satisfaction, but this has reference only to the "matters in dispute *between said plaintiffs and the* [settling] *defendants*," which in the circumstances logically implies—certainly when read with the reservation of rights to continue the prosecution of the action against the remaining defendants—that plaintiffs were merely allowing the settling defendants to buy their peace for a relatively nominal sum.

At all events, even though we are satisfied that such is the plain and unambiguous meaning of the orders, the summary judgments were improvidently granted for another reason: clearly the non-settling defendants wholly failed to discharge their burden to show palpably the absence of a genuine issue of fact supporting their view of the intent of the plaintiffs and the settling defendants in making the compromise.

## IV

If the plaintiffs prevail at the trial questions may arise whether our Contribution Law establishes the right of contribution among joint tortfeasors adjudged liable for a fraudulent wrong, and if it does, how the settlement is to be treated in determining the amount of the judgment to be entered.

The common-law rule against contribution among tortfeasors originated in 1799 in the case of *Merryweather v. Nixan*, 8 *T. R.* 186. That was a trover action for an intentional injury done to the reversionary estate of one Starkey. The judgment against Merryweather and Nixan jointly was

satisfied from the assets of Merryweather who sought, and was denied, contribution from Nixan. American courts, including New Jersey's, extended this common-law principle to all torts, denying contribution whenever the injury resulted from tortious conduct of two or more tortfeasors, whether the conduct was intentional, or unintentional, and merely negligent. *Newman v. Fowler*, 37 *N. J. L.* 89 (*Sup. Ct.* 1874); *Public Service Railway Co. v. Matteucci*, 105 *N. J. L.* 114 (*E. & A.* 1928); *Malinauskas v. Public Service Interstate Transp. Co.*, 6 *N. J.* 269, 274 (1951).

The doctrine came under "vigorous denunciation," in the words of Dean Prosser, as applied to unintentional torts, because of the "obvious lack of sense and justice in a rule which permits the entire burden of a loss, for which two defendants were equally, unintentionally responsible, to be shouldered onto one alone, according to the accident of a successful levy of execution, the plaintiffs' whim or malevolence, or his collusion with the other wrongdoer, while the latter goes scot free." *Prosser, Torts*, 1113 (1941). The harshness of the rule was, however, relieved in equity which allowed contribution upon "the principle that equality among those *in aequali jure* is deemed to be equity." *Kanzler v. Smith*, 142 *N. J. Eq.* 609, 621 (*Ch.* 1948).

The relief in equity was not available, however, "as between conscious, willful, malicious or intentional wrongdoers or tortfeasors who are *in pari delicto*," *Kanzler v. Smith, supra*. This was upon the ground that society's interest in the deterring of intentional wrongdoing would be better served if wrongdoers were taught that they "must not expect that a judicial tribunal will degrade itself by an exertion of its powers by shifting the loss from one to the other; or to equalize the benefits or burdens which may have resulted by the violation of every principle of morals and of laws." *Bartle v. Nult, Administrator of Coleman*, 4 *Pet.* 184, 187, 29 *U. S.* 184, 187, 7 *L. Ed.* 825 (1830); 12 *Harv. L. Rev.* 176, 179 (1898). The soundness of this reasoning was strongly questioned by those who found difficulty in finding

either logic or common sense in a rule which, if it deters the paying tortfeasor from further wrongdoing, encourages those who go scot free to repeat the offense, although equally or perhaps even more morally culpable. These critics urged that the wholesome social objectives of the rule would be "best procured by making certain that none of the tortfeasors will go entirely free." 45 *Harv. L. Rev.* 354, *footnote* 28 (1931); in other words, that if each intentional wrongdoer knew that his conduct was exposing him to the risk of the certainty of liability in some amount, the desired deterrent effect would be produced more surely than if contribution among the wrongdoers is denied.

These judicially created common-law and equitable principles are, of course, vulnerable to extinction or modification at the hands of the Legislature, the ultimate arbiter of public policy. Our problem is whether the Legislature in enacting the Contribution Law of 1952 adopted the policy of allowing contribution not only among unintentional co-tortfeasors but even among intentional, including fraudulent, joint wrongdoers. If the Legislature has enacted the broader right, our judicial function is to declare it however we may deplore the necessity of lending the aid of the courts to suitors guilty of intentional wrongdoing.

The framers of the draft uniform act made clear their recommendation that sections 1 and 2 (1) of the draft act embraced the creation of a right of contribution among tortfeasors without regard to whether the tort from which the liability arose was intentionally or unintentionally inflicted. Section 1 provides that "For the purpose of this act the term 'joint tortfeasors' means two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." Section 2 (1) provides, "The right of contribution exists among joint tortfeasors." That the inclusiveness of all torts implicit in this wording is intended is confirmed by the commissioners' note dealing with the sections, which note states:

"It does not, in any way, qualify the creation of this right by confining it to joint tortfeasors in any narrower sense than that indicated in Section 1. Nor does it confine contribution to merely negligent tortfeasors or to those in any other way inadvertently harming others. It permits contribution among all tortfeasors whom the injured person could hold liable jointly and severally for the same damage or injury to his person or property." 9 *U. L. A.* 158.

Our Legislature adopted verbatim the language of said sections 1 and 2 (1) of the draft act. *N. J. S.* 2*A*:53*A*–1 is section 1 of the draft act, with the addition of a sentence not relevant to the question before us, and *N. J. S.* 2*A*:53*A*–2 is section 2 (1).

The legislative history prior to the enactment of our Act of 1952 buttresses the conclusion that our Legislature adopted the provisions of the draft act in this regard to effect the comprehensive coverage recommended by the framers of the draft act. Assembly bills introduced in 1949, 1950 and 1951, as bills numbered 104, 267 and 242 for the respective years, would have limited contribution to tortfeasors guilty of negligence, and all failed of passage.

But should we infer a Legislative intent for more restrictive coverage from section 3 of our act providing for contribution "where injury or damage is suffered by any person as a result of the *wrongful act, neglect or default* of joint tortfeasors"? This wording is not found in the draft of the uniform act. Appellant's brief on the reargument concedes that the term "wrongful act" is most broad and comprehensive. Such has been the uniform holding of our cases. In *Louis Schlesinger Co. v. Rice*, 4 *N. J.* 169, 181 (1950), for example, Justice Heher noted that "a 'wrongful act' is any act which in the ordinary course will infringe upon the rights of another to his damage, except it be done in the exercise of an equal or superior right." But, appellants urge, the words "neglect or default" immediately following "wrongful act" must be taken to qualify "the otherwise broad sweep of the term 'wrongful act'" and confine the coverage of the statute to cases of torts due to negligence.

We saw no reason, in *Earl v. Winne,* 14 *N. J.* 119, 129 (1953), to reach that result under *N. J. S.* 2*A*:14–2 reading

"Every action at law for *an injury to the person caused by the wrongful act, neglect or default of* any person within this state shall be commenced within 2 years next after the cause of any such action shall have accrued."

We held that that statute applies to an action for damages for false imprisonment, "a wrong akin to the wrongs of assault and battery, and consists in imposing, by force or threats, unlawful restraint upon a man's freedom of locomotion." And the statute creating a right of action for death by wrongful act, *N. J. S.* 2*A*:31–1 *et seq.,* gives the right whenever "the death of a person is caused by *a wrongful act, neglect or default,* such as would, if death had not ensued, have entitled the person injured to maintain an action for damages resulting from the injury." We are aware of no authority in this State which has suggested a limitation of the right of action under that statute to cases of death resulting from negligence. The statute was adopted from England, and 23 *Halsbury's Laws of England* (*2d ed.* 1936), *p.* 691, is authority that "This term includes direct acts of trespass to the person, as well as criminal acts of violence." See also *Sullivan v. Dunham,* 161 *N. Y.* 290, 55 *N. E.* 923, 47 *L. R. A.* 715 (*Ct. App.* 1900).

 The very fact that we are not cited to any decision which construes "neglect or default" as apposite to "wrongful act" in any of the several statutes employing the common expression "wrongful act, neglect or default," is itself a forceful argument that the Legislature did not employ the expression in the statute before us here as a limitation upon its coverage. The more reasonable interpretation is that the expression was included to fortify the intended comprehensiveness of sections 1 and 2 taken from the draft of uniform act and leave no doubt that all torts of commission and omission were within the ambit of the law.

## V

We turn, then, to the bearing of the settlement upon the contribution rights of the remaining defendants if they suffer a verdict for damages.

 The basic purpose of the statute is to achieve the "sharing of the common responsibility according to equity and natural justice," *Sattelberger v. Telep*, 14 *N. J.* 353, 367 (1954); *Pennsylvania Greyhound Lines, Inc. v. Rosenthal*, 14 *N. J.* 372, 386 (1954). This end is attained by allowing actions among the joint tortfeasors to assure that none pays in excess of his *pro rata* share of the total damage. When one tortfeasor settles with the injured party for an amount which is less than the settler's *pro rata* share, equality between him and his co-wrongdoers may be realized in one of two ways: *first*, the injured person may be required to credit upon any verdict against the others not the consideration received in settlement but the settler's *pro rata* share of the amount of the verdict, or, *second*, the injured party may have a judgment for his total damage less the consideration received in settlement, and the judgment tortfeasor who pays in excess of his *pro rata* share may have his action against the settler for contribution.

 The second alternative is the one adopted in sections 4 and 5 of the draft of uniform law. It may lead to some undesirable results: If the injured party is required to credit only the amount received in settlement, *Gelsmine v. Vignale*, 11 *N. J. Super.* 481 (*App. Div.* 1951), he may be tempted to make collusive settlements, a mischief incident to the denial of contribution which was one of the strongest reasons for the statutory change allowing a right of contribution. Also, the settlement then lacks finality because the settler cannot count on his adjustment with the injured person as ending the matter but must apprehend a suit at the hands of his co-tortfeasors. This would have a stifling effect upon efforts at compromise and settlement, contrary to the policy of our law which strongly favors disposition

of disputes by compromise and settlement. *Rynar v. Lincoln Transit Co., Inc.,* 129 *N. J. L.* 525, 528 (*E. & A.* 1942).

If, then, as said by Justice Rutledge, "The problem is to blend the themes of compromise and contribution, maintaining the essential integrity of each as far as possible," *McKenna v. Austin, supra,* the first alternative is clearly preferable. Collusive settlements are wholly ineffective when a credit of the settler's *pro rata* share is the required result of any settlement, and this helps attain one of the objectives of the contribution statute. And, thereby the settling tortfeasor is assured of the finality of his settlement, and impairment of the public policy favoring compromise is avoided. The injured party should not be discouraged from settlement by such a rule. He cannot complain of unfairness, since "* * * the reduction would be a direct result of his own act in accepting less than [the settler's *pro rata* share of] the total recoverable damages in settlement with the compromising wrongdoer." *McKenna v. Austin, supra.* Thus, if the settlement is not collusive, he makes it upon the basis of his own appraisal of the risks of recovery and will hardly be deterred from it because it may later eventuate that he accepted less than the settler's *pro rata* share.

Our Legislature's rejection of sections 4 and 5 of the draft act clearly indicated its preference for the first alternative. True, the statute contains nothing whatever expressly dealing with the effect of a settlement, but the first alternative is a logical incident of the created right of contribution and no provision expressly stating that effect was necessary. The aim of the statute to make a settler responsible for his *pro rata* share is realized when the credit on the total damage is in the amount of that *pro rata* share, and provisions for a right of action against him at the hands of his co-tortfeasors were unnecessary. Any remaining problems of contribution are limited to such as may arise among the non-settling defendants when the payment by any one of them upon the reduced joint judgment exceeds his *pro rata* share of the total damage.

*Pro rata* shares are to be determined on the basis of the number of tortfeasors commonly liable who are available, that is, not beyond the reach of process, and are solvent. This has been the principle followed in our cases. *Johnson v. Tennessee Oil, etc., Co.,* 75 *N. J. Eq.* 314, 316 (*Ch.* 1909). The option offered by section 2(4) of the draft act permitting apportionment of the common liability among the joint tortfeasors according to their relative degrees of fault was not adopted by our Legislature.

To illustrate the operation of our statute: If plaintiffs herein obtain a verdict against the three non-settling defendants for the claimed damages of $315,000, the *pro rata* shares of the five defendants, assuming none is shown to be insolvent (they have all been served with process and that element of the equity rule does not concern us in this case) will be $63,000 each. The credit upon the judgment to be entered upon the assumed verdict of $315,000 of total damage will be $126,000, the sum of the *pro rata* shares of the two defendants who settled. If the *pro rata* shares are adjusted by reason of the proved insolvency of any one or more of the defendants (an issue, if raised, more properly to be determined in a proceeding conducted subsequent to the verdict and before the final entry of the judgment) the credit will be adjusted accordingly.

Reversed.

HEHER, J. (concurring). The record here does not reveal the want of a genuine issue of fact as to the fraud laid against the responding defendants, and I concur in the holding of error in the entry of summary judgment on the contrary hypothesis.

But I dissent from the interpretation given the New Jersey Joint Tortfeasors Contribution Law, *L.* 1952, *c.* 335, *N. J. S.* 2A:53A–1 *et seq.*, as encompassing within the essentially equitable doctrine of contribution all torts no matter how flagrant or steeped in villainy and moral depravity they may be.

We are not here concerned with the meaning of the Uniform Contribution among Tortfeasors Act recommended by the National Conference of Commissioners on Uniform State Laws, 9 *U. L. A.* 156, for the model act has not been embraced by New Jersey. That submission and our own statute are different in basic content.

True, the model act designed to accomplish uniformity of principle and ours embody the common provision, *section 2,* that "The right of contribution exists among joint tortfeasors," defined as "two or more persons jointly and severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them," thus excluding joint and several judgment liability as a condition prerequisite to contribution. But *section 3* of the New Jersey act, *N. J. S. 2A:53A–3,* has a provision not to be found in the commissioners' model act which limits the class of "joint tortfeasors" whose derelictions are made subject to the doctrine of contribution, a regulative measure that has no place in the operative terms of the statute unless such was the legislative purpose. *Section 3* confines the operation of the principle to cases where "injury or damage" is suffered by any person as a result of the "wrongful act, neglect or default of joint tortfeasors," for which a money judgment is recovered.

Since it is fundamental in exegesis that all the terms of a statute be related and reconciled for the ascertainment of the essential legislative policy, is it not corollarially true that the words "tort" and "joint tortfeasors" are modified by the subsequent operative clause "wrongful act, neglect or default" of joint tortfeasors? If it is not a qualifying phrase, what meaning can it have? Its significance lies in the inexorable fact that it is a condition supplied by our own Legislature in framing the operative terms of the statute— an unequivocal refusal to accept the model act in all its essentials, for "tort" is patently a word of more extensive meaning than "wrongful act."

There is a distinction of substance between the word "tortfeasors" and the word "wrongdoers." 13 *Am. Jur.* 34; see also *n.* 6. This differentiation has pervaded the law of contribution from the very beginning; and it cannot be ignored in assessing the legislative intention here. At common law a tort is defined "as a civil wrong for which the remedy is a common-law action for unliquidated damages, and which is not exclusively the breach of a contract or the breach of a trust or other merely equitable obligation." *Salmond on the Law of Torts, p.* 13. "Wrongful act" is not an equivalent term; it is not a word of art which has an absolute meaning under any and all circumstances; its significance of necessity depends upon the context of its use.

It is an elementary canon of statutory interpretation that ordinarily the coupling of words denotes an intention that they shall be understood in the same general sense. The natural, ordinary and general meaning of terms and expressions may be limited, qualified and specialized by those in immediate association. Words of general and specific import take color from each other when associated together, and thus the word of general significance is modified by its associates of restricted sense. The general word is qualified by the particular word. *Ford Motor Co. v. New Jersey Department of Labor and Industry,* 5 *N. J.* 494 (1950) ; *Jersey Central Power & Light Co. v. State Board of Tax Appeals,* 131 *N. J. L.* 565 (*E. & A.* 1944); *Fedi v. Ryan,* 118 *N. J. L.* 516 (*Sup. Ct.* 1937).

Here, "wrongful act" is characterized by its associates "neglect or default," the whole meaning the positive and the negative breaches of duty in nature the same—acts of commission and omissions and failures not intentional, criminal, fraudulent or tainted with moral turpitude.

The legislative expression is to be assayed in the background of the legal history. At common law there is no right of contribution between joint tortfeasors who are *in pari delicto*; the common law distinguishes in this regard between a recovery in tort and a joint judgment against several de-

fendants in an action of *assumpsit*. *Merryweather v. Nixan*, 8 *T. R.* 186, 101 *Eng. Rep.* 1337 (1789). Legal scholars have criticized as singularly unfortunate, giving rise to misunderstanding and confusion, that this English case has been treated as declaring the "general rule." It is suggested that the case states not the rule, but the exception—the general rule being that among persons under a joint liability the law implies an *assumpsit* for contribution; and the exception, that no *assumpsit*, either express or implied, will be enforced among willful tortfeasors or wrongdoers. See 12 *Harvard L. Rev.* 176, *Contribution Between Persons Jointly Charged for Negligence*, by *Theodore W. Reath; Restatement, Restitution, pp.* 386–388; also *sections* 86–88. And see *Goldman v. Mitchell-Fletcher Co.*, 292 *Pa.* 354, 141 *A.* 231 (*Sup. Ct.* 1928); 18 *C. J. S., Contribution*, § 11, *pp.* 16, 17, 18.

The commissioners' model act no doubt was designed to accomplish some measure of uniformity in jurisdictions having essentially different concepts of permissible contribution between joint tortfeasors—those denying contribution only as between conscious, willful, malicious or intentional joint tortfeasors who are *in pari delicto, e. g., Jacobs v. Pollard*, 10 *Cush.* 287 (*Sup. Jud. Mass.* 1852), and those refusing it in all cases of tort, intentional and unintentional, as in New Jersey, *Manowitz v. Kanov*, 107 *N. J. L.* 523 (*E. & A.* 1931); and these background considerations are necessarily to be regarded in the quest for the legislative purpose here. Such a distinction has been made between breaches of trust tainted with fraud or bad faith, those morally wrong, and defaults devoid of fraudulent intent. 66 *A. L. R.* 1092.

Contribution has its roots in the equitable principle of equality among those *in aequali jure*, a sharing of the common responsibility and burden according to equity and natural justice. *Sattelberger v. Telep*, 14 *N. J.* 353, 367 (1954). But the rule is basically one of public policy, *Manowitz v. Kanov*, cited *supra*; and it would seem that a

rule of policy sustained by experience from early times is not to be abrogated in favor of contribution between those who knowingly and willfully do grievous injury to person or property in the pursuit of a conspiratorial design, unless the legislative intent to that end be expressed in clear and indubitable terms. We have another apposite rule of interpretation that a statute in derogation of the common law is to be strictly construed. Fundamental policy that has stood the test of the ages, as founded in sound public morality, should not be set at naught unless the Legislature has affirmed that purpose in terms not open to doubt. The judicial process should not be made available for the relief of one conspirator as against a co-conspirator in the common design to commit a fraud or a crime against a third person who is damaged by its execution, unless there be a declaration of the new policy in unequivocal terms. Under the view of the statute now taken, the perpetrators of a murderous assault by concert would be entitled to invoke the judicial process to enforce contribution as between themselves for the damages ensuing to another from their felonious act. And the example can be multiplied. It goes without saying that a change of policy so radical should not be left to mere implication from uncertain and ambiguous language reasonably susceptible of a narrower meaning.

It was said in an early case that the "reason why the law refuses its aid to enforce contribution amongst wrongdoers, is that they may be intimidated from committing the wrong, by the danger of each being made responsible for all the consequences; a reason which does not apply to torts or injuries arising from mistakes or accidents, or involuntary omissions in the discharge of official duties." *Thweatt's Administrator v. Jones*, 1 *Rand.* 328, 332 (*Va. Ct. of App.* 1823).

Such, I submit, is the reason and spirit of the New Jersey Act, a modification of the rule of *Manowitz v. Kanov, supra.* There is no suggestion of an intention to give willful fraud-

doers and *particeps criminis* the benefit of the equitable principle of contribution.

And there is also the underlying basic general rule of social and juridical policy that the law will not lend its aid to him who founds his cause of action upon an immoral or illegal act, nor will it undertake to adjust the burdens of culpable misconduct, but will leave the parties where it finds them. *Selz v. Unna*, 6 *Wall*. 327, 18 *L. Ed.* 799 (1868); *Coventry v. Barton*, 17 *Johns*. 142 (*Sup. Ct. N. Y.* 1819); 13 *Am. Jur*. 36, 37; 18 *C. J. S., Contribution*, § 11, *p*. 15. It is a settled rule of interpretation that a legislative purpose to overthrow firmly established policy, as the fruit of immemorial experience, is not to be implied but expressed in clear and unequivocal language, and then only to the extent that the terms and objects of the new legislation unmistakably require. *Bayonne Textile Corporation v. American Federation of Silk Workers*, 116 *N. J. Eq*. 146 (*E. & A.* 1934); *Murdock v. City of Memphis*, 20 *Wall*. 590, 22 *L. Ed*. 429 (1875); *Haggett v. Hurley*, 91 *Me*. 542, 40 *A*. 561, 41 *L. R. A*. 362 (*Sup. Jud. Ct*. 1898); *E. D. Clough & Co. v. Boston & Maine R. R. Co.*, 77 *N. H*. 222, 90 *A*. 863 (*Sup. Ct*. 1913); *Gould v. Parker*, 114 *Vt*. 186, 42 *A*. 2d 416, 159 *A. L. R*. 622 (*Sup. Ct*. 1945). See also 50 *Am. Jur*. 281.

In fine, there is an obvious difference, basic to our jurisprudence, in the interpretive approach to a remedial statute for redressing the victim of a wrong, and a statute providing a remedy for joint wrongdoers as against one another; and the difference is, I would suggest, decisive in assessing the legislative meaning here. The statute is wanting in the imperative quality of definitive clarity.

In this view, the settlement with the Peoples Bank and Trust Company and the Estate of Charles M. Smith, and the consequent consent judgments of dismissal as to them, do not prejudice the rights of these co-defendants under the Contribution Law, nor operate as a discharge of all defendants.

Mr. Justice WACHENFELD joins in this opinion.

HEHER and WACHENFELD, JJ., concurring in result.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For affirmance*—None.