270 N.J. Super. 339 (1994)
637 A.2d 205
LIZETTE ARENCIBIA, PLAINTIFF-APPELLANT,
v.
JULIAN ROSAS, HECTOR ROSAS, AND CATHERINE ULRICH, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted January 20, 1994.
Decided February 7, 1994.
*341 Before SHEBELL, LONG and LANDAU, JJ.
Bazzani & Gonzalez, attorneys for appellant (Ramon M. Gonzalez, on the letter brief).
Haggerty, Donohue & Monaghan, attorneys for respondents, Rosas (Alfred F. Carolonza, Jr., on the brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
Plaintiff, Lizette Arencibia, appeals from the Law Division's dismissal of her personal injury action on summary judgment based on the judge's determination that plaintiff had failed to satisfy the verbal threshold of N.J.S.A. 39:6A-8. We reverse and remand.
On September 21, 1989, plaintiff was a passenger in an automobile owned by Hector Rosas and driven by her then boyfriend, now husband, defendant Julian Rosas, in North Bergen, when it struck the rear of an automobile, owned and operated by defendant, Catherine Ulrich, that was stopped at a red traffic light. On January 31, 1991, plaintiff filed a complaint alleging that she had sustained injuries because defendants, Julian Rosas and Catherine *342 Ulrich, negligently and carelessly operated their vehicles so as to cause them to collide.
The matter was submitted to arbitration on January 24, 1992. The arbitrator found Julian Rosas, 100% liable and defendant, Catherine Ulrich, 0% liable. Plaintiff's damages were found to be $17,500. Rosas, requested a trial de novo pursuant to R. 4:21A-6(b) and R. 4:21A-6(c).
On November 23, 1992, Rosas filed a notice of motion for summary judgment, in which defendant, Ulrich, joined. The Law Division judge granted summary judgment in favor of defendants, stating:
The plaintiff in this case does not seem to have had any treatment for these injuries which were basically a sprain of the cervical and lumbar regions for the last three years. The  if I'm correct, the latest medical was in 1990. Dr. Dasika, whose report is dated February 28, 1990, said further diagnostic and therapeutic recommendations are to be predicated on her further course.
The Court simply is not satisfied that this accident has had a significant impact on the life of this young lady. She had a sprain, she went to her chiropractor, she had a neurological consultation. But it simply seems to be the kind of case that is contemplated by the Legislature and by Oswin as a soft tissue case, which does not meet the verbal threshold. In addition, there is evidence on the defendant's side by Dr. Foddai that any injuries she had were resolved. Therefore, I am going to grant defendant's motion in this case.
Plaintiff, twenty-five years of age, maintains that as a result of the impact, her upper forehead hit the windshield and her hands must have hit the dashboard. She thinks the windshield cracked as a result of this impact. She was bleeding from the top of her head, but did not notice what other parts of her body were in pain because she was "too much in shock." She did not get out of the car at the scene of the accident.
After the police officers had obtained all necessary information, Rosas drove plaintiff directly to a hospital. Plaintiff was not treated at the hospital because she was kept waiting too long. Plaintiff went home and the next day visited a specialist in internal medicine. She complained of headaches and lower back pains and was advised to see other physicians. She went to her family *343 physician the next night. He performed a physical examination and advised her to see a chiropractor.
Plaintiff sought treatment from Dr. Jose Bravo, a forensic neurologist, on October 7, 1989. Dr. Bravo's medical report of that date detailed plaintiff's complaints of pain in her neck, shoulders, and lower back. He found limited range of motion in her neck and moderate to severe spasm of her thoracolumbar spine. He listed his diagnosis as:
1. Cerebral concussion and post concussional syndrome.
2. Hyperextension injury to the neck with resultant cervical sprain and cervical radiculopathy C5-C6 on the left.
3. Thoracolumbar sprain and resultant myofascilitis.
4. Post traumatic stress syndrome.
Dr. Bravo reported that "there is a definite causal relationship between the injuries sustained by this patient in a motor car accident on 9/21/89 and the residual impairment that she has exhibited."
Dr. Bravo's final report of September 27, 1990, recounted plaintiff's six visits to his office. Dr. Bravo found "[n]o change in condition or clinical signs" during the period from October 14, 1989, through December 4, 1989, when he last saw plaintiff. Plaintiff's MRI of the cervical spine and lumbar spine "was normal" and she also "underwent a normal EEG." His report states: "EMG and NCV of the left upper limb and retrocollic area were abnormal indicating a radiculopathy with involvement of posterior rami." His office note of December 4, 1989, indicated plaintiff "was given follow up appointment." Apparently, this was not carried out. Dr. Bravo concluded that plaintiff's "prognosis remains reserved."
On October 12, 1989, plaintiff began treatments with Dr. Anthony W. Marsh, a chiropractor. His report states that orthopedic testing of the cervical, thoracic, and lumbosacral regions "revealed signs consistent with neurospinal compression in the form of neurapraxia." He further reported that he found "[c]orollary indications of post-traumatic moderate to severe musculo-ligamentous *344 tethering and contusion...." He stated that plaintiff's ranges of motion "were compromised with attendant hyperalgesia" and "[p]apable reactive paraspinal muscular splinting with evident effusion" was noted.
Dr. Marsh's neurologic examination showed "evidence of motor weakness affecting the cervical and lumbosacral flexors, extensors, bilateral lateral flexors, and bilateral rotators...." X-rays taken at his office of the cervical spine were reported to have revealed "reduction of the neutral lateral curves," and that "George's Line was seen to break at the C-3-C4 and C4-C5 indicating marked subluxation with sprain." Further, the x-rays displayed that the "physiological lines of stress were altered indicating fixation, subluxation and sprain due to acute trauma."
Dr. Marsh's diagnosis was as follows:
1) Acute cervical sprain/strain with associated deep and superficial muscle spasm; myofascitis and radiculitis.
2) Acute bilateral brachial radiculoneuropathy.
3) Acute vertebrogenic encephgia.
4) Acute thoracic strain/sprain with associated deep and superficial muscle spasm; myofascitis and radiculitis.
5) Acute lumbosacral sprain/strain with associated deep and superficial muscle spasm; myofascitis and radiculitis.
Dr. Marsh's treatment consisted of "electro muscle stimulation, non-force reflex therapy, applied kinesiological therapeutics and rest." He treated plaintiff from October 12, 1989, through March 22, 1990, for a total of sixty-five visits. Dr. Marsh concluded that plaintiff "will continue to suffer from recurrent neck pains due to damaged musculotendinous and ligamentous supportive elements facilitating subluxation complexes with resultant pain." He opined that "these injuries are permanent and causally related to the automobile accident as of 9/21/89."
Plaintiff was also treated by a second neurologist, Dr. Vijay Dasika. His report of February 28, 1990, states:
Tenderness was noted over the left cervical and lumbo-sacral spine with limitation of movement of the cervical spine 30% from pain and lumbo-sacral spine 30% from *345 pain. Straight leg raising test was positive on the right and left sides at 50 degrees.
His diagnosis was: "1. Post-concussion syndrome with post-traumatic migraine; 2. Cervical sprain; 3. Lumbo-sacral sprain." Dr. Dasika opined plaintiff's prognosis was:
Guarded residual pain and restriction of movement of the neck and lower back aggravated in inclement weather. Recurrent episodes [of] post-concussion syndrome. Further diagnostic and therapeutic recommendations are to be predicated on her further course. Accordingly, neurological follow up as necessary has been advised and she is to return for your continuing care.
Dr. Dasika prescribed various medications for pain which plaintiff continues to take. Plaintiff's last treatment for these injuries was on March 22, 1990, by Dr. Marsh.
At the request of defendants, plaintiff was examined and evaluated on August 10, 1992, by Dr. Paul Foddai, an orthopedic surgeon. Dr. Foddai stated that his examination of plaintiff's spine revealed that everything was "normal." He found "full range of motion with no guarding or spasm." His neurological testing disclosed normal reflexes and normal motor sensory examination. Dr. Foddai concluded that plaintiff had sustained a cervical and lumbosacral sprain which has since been "significantly resolved." He opined that her "prognosis is favorable" and that "there should be no permanency as result of the injury sustained in this accident."
Plaintiff's deposition was taken on June 30, 1992. She testified that she has pain and discomfort in her lower back and neck when she performs her job as a payroll clerk. She is unable to sit for more than four hours. She is no longer able to exercise at the gym and lift weights, which she enjoyed doing before the accident. She added that when she attempts to exercise at home to an aerobic exercise tape, her "back hurts after awhile." Plaintiff further testified that she gets pains in her back if she attempts to lift anything heavy or when she sits for a long period of time.
Plaintiff, in her certification dated December 31, 1992, offered in response to defendants' motions for summary judgment, an assertion that her neck and back bother her on a daily basis and this *346 pain prevents her from lifting anything heavy, from exercising at the gym, and it also curtails her work activities. She states that she is still required to take pain medication when the pain becomes unbearable. She further avers that she never experienced these problems prior to this automobile accident.
Pursuant to R. 4:46-2, summary judgment may only be granted if "the pleadings, depositions, answer to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to judgment or order as a matter of law." Even though the allegations of the pleadings may raise an issue of fact, if the other papers show that there is no real material issue, then summary judgment can be granted. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 75, 110 A.2d 24 (1954).
At the time of the accident, plaintiff did not have an automobile or automobile insurance coverage, nor did she reside in a household where there was coverage. Hence, plaintiff is considered to be subject to the verbal threshold statute. See Murphy v. Allstate Ins. Co., 252 N.J. Super. 280, 599 A.2d 916 (App.Div. 1991). Plaintiff makes no argument that the verbal threshold statute does not apply here.
In Oswin v. Shaw, 129 N.J. 290, 307, 609 A.2d 415 (1992), our Supreme Court devised a two-part test for determining verbal threshold questions. That test is: "(1) whether under any view of the plaintiff's injuries they can be said to fall within at least one of the nine categories that New Jersey's statute specifies, and (2) if so, whether the evidence before the court on motion for summary judgment demonstrates a material dispute of fact regarding the nature and extent of plaintiff's injuries." Id. at 307, 609 A.2d 415.
Therefore, the trial court must find that the medical records and other evidence submitted regarding plaintiff's injuries, as a matter of law, "carry the plaintiff's case across the verbal threshold," otherwise "the defendant will prevail on the *347 motion." Ibid. If the plaintiff's medical proofs survive this initial test, and the court finds a legitimate, factual dispute over the nature and extent of the injuries, "then resolution of that dispute is of course for the jury." Ibid.
The verbal threshold statute provides, in pertinent part:
Every owner, registrant, operator, or occupant of an automobile to which section four of P.L. 1972, c. 70 (C. 39:6A-4), personal injury protection coverage, regardless of fault, applies, and every person or organization legally responsible for his acts or omissions, is hereby exempted from tort liability for non-economic loss to a person who is subject to the subsection and who is either a person who is required to maintain the coverage mandated by this act, or is a person who has a right to receive benefits under section 4 of P.L. 1972, c. 70 (C. 39:6A-4), as a result of bodily injury, arising out of ownership, operation, maintenance or use of such automobile in this State, unless that person has sustained a personal injury that results in [1] death; [2] dismemberment; [3] significant disfigurement; [4] a fracture; [5] loss of fetus; [6] permanent loss of use of a body organ, member, function of system; [7] permanent consequential limitation of use of a body organ or member; [8] significant limitation of use of a body function or system; [9] or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute that person's usual and customary daily activities for not less than 90 days during 180 days immediately following the occurrence of the injury or impairment. [N.J.S.A. 39:6A-8a.]
We conclude that plaintiff's injuries satisfy category seven: "permanent consequential limitation of use of a body organ or member" and/or category eight: "significant limitation of use of a body function or system." N.J.S.A. 39:6A-8a. The term "significant," in category eight of the statute, is "`construed to mean something more than a minor limitation of use.'" Oswin, supra, 129 N.J. at 316, 609 A.2d 415 (quoting Licari v. Elliott, 57 N.Y.2d 230, 455 N.Y.S.2d 570, 573, 441 N.E.2d 1088, 1091 (1992)). The medical evidence shows that plaintiff has satisfied the verbal threshold requirements as delineated in Oswin.
Dr. Bravo, a neurologist, found limited range of motion in plaintiff's neck, along with moderate to severe spasm of the thoracic and lumbar areas of the spine. Spasm is an objective form of evidence. Oswin, supra, 129 N.J. at 320, 609 A.2d 415. However, the record shows much more than only this evidence of spasm. Dr. Bravo also noted in his final report of September 27, *348 1990, that plaintiff's "EMG and NCV of the left upper limb and retrocollic area were abnormal indicating a radiculopathy with involvement of posterior rami."
Likewise, Dr. Marsh found objective evidence that plaintiff's ranges of motion "were compromised." He stated that plaintiff had deep and superficial spasm of the cervical, thoracic, and lumbosacral sections of the spine. He also reported that x-rays of the cervical spine revealed "reduction of the neutral lateral curves." These x-rays also indicated "marked subluxation with sprain." Under Oswin, x-rays may provide the needed objective evidence. Ibid.
Another neurologist, Dr. Dasika found a thirty percent limitation of movement of the cervical and lumbosacral sections of the spine. Plaintiff continues to take the pain medications that Dr. Dasika prescribed for headaches and pain.
All of plaintiff's treating physicians concluded that plaintiff's injuries were sustained in the automobile accident of September 21, 1989, and all found permanency or significant limitation caused by plaintiff's injuries.
Dr. Marsh asserted that plaintiff's injuries were "permanent" and that she will continue to suffer recurrent neck pains. Dr. Dasika opined that plaintiff will continue to suffer residual pain and restriction of the neck and lower back, particularly in inclement weather. Dr. Bravo concluded that plaintiff's "prognosis remains reserved." Although defendants' doctor claimed plaintiff should have no permanency, the clear import of his statement that her neck and back pains have "significantly resolved" is that almost three years after the accident, resolution had not been complete.
Oswin states that the injury itself does not fulfill the statutory requirements, "rather the resultant loss and disability are the key." 129 N.J. at 318, 609 A.2d 415. Plaintiff has satisfied this burden. Plaintiff, twenty-five years old at the time of the accident, testified of difficulty performing her job as payroll clerk, *349 because she cannot sit for more than four hours at a time without suffering pain and discomfort in her lower back and neck. She also testified that she can no longer exercise at the gym, an activity that she enjoyed prior to the accident. By certification dated December 31, 1992, she affirmed that her neck and back bother her on a daily basis and this pain prevents her from lifting anything heavy and from doing any exercise. She also must take medication when the pain becomes unbearable. This evidence supports her contention that the injury has had a "serious impact" on her life and has resulted in loss and disability.
Even when there is medical evidence to dispute whether a plaintiff has met the verbal threshold, the issue is to be determined at trial. Brown v. Puente, 257 N.J. Super. 203, 209, 608 A.2d 377 (App.Div. 1992). In Brown, the defense expert concluded that there was no substantial impact on plaintiff's life as a result of his injuries. 257 N.J. Super. at 208, 608 A.2d 377. We held, nonetheless, that this disputed issue as to whether the plaintiff had met the "verbal threshold" presented a jury question. Ibid. The conflicting medical reports in this case, as in Brown, prevent entry of summary judgment. Ibid.
Reversal is required as plaintiff's injury claim meets the requirements of Oswin. Summary judgment was improperly granted.
Reversed and remanded.